1999 SD 50

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Melvin E. WRIGHT, Defendant and Appellant.**

No. 20364.

Supreme Court of South Dakota.

Considered on Briefs Dec. 2, 1998.

Reassigned Jan. 27, 1999.

Decided April 14, 1999.

Mark Barnett, Attorney General, Michele K. Bennett, Assistant Attorney General, Pierre, South Dakota, for plaintiff and appellee.

Timothy J. Rensch, Rapid City, South Dakota, for defendant and appellant.

KONENKAMP, Justice (on reassignment).

[¶ 1.] Believing his son was responsible for a fire in their home, defendant punched the child in the stomach, banged his head against a wall, then whipped and kicked him. In his trial for child abuse, defendant asserted that these actions were justified as appropriate parental discipline in response to the child's dangerous misbehavior. The prosecution was allowed to offer proof of two similar punishments defendant earlier administered to his children for relatively minor infractions. When the defense was justification, was it error for the trial court to admit the prior acts of abuse to show criminal culpability and to negate an inference of accident or a claim of justification? Because this evidence was highly relevant to the defendant's state of mind, and its probative value was not substantially outweighed by its prejudicial impact, we uphold its admission. We affirm on all issues.

### Facts

[¶ 2.] Defendant Melvin Wright lived in Rapid City, South Dakota, with his son, E.W., age fourteen, and daughter, L.W., age eleven. On Saturday night, January 11, 1997, disobedient to his father's earlier instructions, E.W. lit candles in his basement bedroom. At 3:30 a.m. he awoke to find his room filled with smoke and his record player in flames. He put out the fire with his shirt. The exact cause of the fire was never conclu-

sively determined, but E.W. could not recall with certainty if he had snuffed out the candles before falling asleep. No one claimed he intentionally started the fire, though.

[¶ 3.] After the fire was out, E.W. went upstairs to his sister's room. She awoke, and Dena Edwards, a friend of the family who was sleeping in L.W.'s bedroom, also awoke. Smoke had risen into the upstairs portion of the house. Edwards yelled to Wright, who was sleeping on the couch in the living room, that the house was on fire. E.W. had been afraid to tell his father. Wright quickly found the source of the now extinguished fire in E.W.'s bedroom. Confronting his son, Wright began yelling, "Why didn't you tell me?" He pushed E.W. onto a couch and punched him in the stomach with a closed fist. Then, grabbing him by the ears, Wright banged the back of his head against the wall approximately five times, still yelling "Why didn't you tell me?" Next, told to clean up the mess, E.W. bent down to pick up the melted remains of the record player. Wright grabbed a lamp and whipped E.W.'s back with its cord four or five times, drawing blood. While whipping him, Wright kicked him in the right eye with his bare foot.

[¶ 4.] On Monday, after E.W finished his shower following physical education class, two teachers noticed his injuries. When asked about them, the boy blamed the neighbor's dog. Skeptical, the teachers notified the principal, who in turn contacted Deputy Maryann Ebach, the school liaison officer. E.W. told her about the fire and the beating. She notified the Department of Social Services and Cory Brubakken, a child protection worker, came to interview E.W. Ebach and Brubakken then questioned L.W. at her school.

[¶ 5.] After speaking with both children, Ebach and Brubakken went to Wright's home. He told them about the fire, but after learning that they were investigating his son's injuries, he declined to talk with them further without an attorney. Ebach arrested him and the children were taken into protective custody. Wright was charged with felony child abuse in violation of SDCL 26–10–1: "Any person who abuses, exposes, tortures, torments, or cruelly punishes a minor in a

manner which does not constitute aggravated assault, is guilty of a Class 4 felony." He was also charged as a habitual offender under SDCL 22–7–7.

[¶ 6.] The State sought to introduce six earlier instances of alleged abuse under SDCL 19–12–5 (Rule 404(b)). Following a hearing, the trial court decided to admit two of the six acts. The first incident, involving L.W., occurred nine years earlier when she was two years old. Wright struck her ten to twenty times on the back and buttocks for spilling baby powder. As a result, she was severely bruised across her back and down the back of her legs. She also had a bruise on her forehead. But most notably, she had "dark purple" bruising inside both ears, as well as bruises on and behind her ears. For this beating, Wright pleaded guilty to child abuse.

[¶ 7.] The second episode involved E.W. and occurred in February 1995. Wright arrived at the Boys Club to pick him up. When E.W. showed up late, Wright backhanded him across the face. Crying with a bloody nose, E.W. went into the Girls Club to get L.W. Workers asked about his injuries. When he told them what happened, they called the police. The trial court found these two occurrences relevant to the present charge and concluded that their probative value was not substantially outweighed by the danger of unfair prejudice. Nonetheless, the court refused to allow the State to introduce Wright's child abuse conviction or pictures of L.W.'s injuries.

[¶ 8.] At trial, defense counsel asserted a single defense: justification.[1] While emphasizing E.W.'s culpability for the fire, the defense minimized his injuries and pain, and claimed he lied about being kicked and punched. Nonetheless, counsel neither denied that punishment was deliberately imposed nor contended that E.W.'s injuries were inflicted accidentally. In her opening statement, she referred to an ongoing public debate about appropriate child discipline in extreme cases and quoted the biblically based injunction, "spare the rod and spoil the child." The trial court instructed the jury that the other act evidence may be used to

---

1. Appellate counsel was not defendant's attorney at trial.

show "motive, intent, absence of mistake or accident, common scheme, or identity of the person charged."

[¶ 9.] During the trial, both Ebach and Brubakken testified that Wright declined to talk further with them after they broached the subject of E.W.'s injuries. Wright objected, claiming the testimony violated a motion in limine precluding comment on his invocation of his right to have an attorney. He demanded a mistrial. The court denied the motion finding that the testimony did not violate the motion in limine and was not prejudicial because the witnesses never mentioned Wright's remark about an attorney. The jury found Wright guilty of felony child abuse and he later pleaded guilty to the habitual offender charge. He was sentenced to fifteen years in the penitentiary.

[¶ 10.] After the trial, the defense interviewed jurors and learned that a note had been sent to the judge before the final recess on the first day of deliberations. The note asked for a dictionary and aspirin. It was given to the bailiff, but never delivered to the judge. On the following morning the jury continued deliberations and reached a verdict by noon. As it happened, only one juror wanted the dictionary. She sought to learn the definition of "maltreat" used in the instruction defining "abuse." [2] During the overnight break, the juror looked up the word in her dictionary; the definition was consistent with the one given her by other jurors. She remembered telling one juror that he was right about the definition. Wright moved for a new trial alleging juror misconduct. At a hearing, eleven of the twelve jurors testified. The trial court found that juror misconduct had occurred, but declined to grant a new trial because it found that the misconduct had not influenced the verdict.

[¶ 11.] On appeal, Wright asserts the following issues: (1) "Whether the admission of prior bad acts during the case-in-chief was prejudicial error when there was no relevant issue of identity, intent, knowledge, or modus operandi." (2) "Whether the reference to Melvin Wright's refusal to talk to the authorities which was objected to and resulted in a motion for mistrial is reversible error." (3) "Whether or not the court's refusal to give defendant's proposed jury instruction constitutes reversible error." (4) "Whether the juror's use of a dictionary definition of 'maltreat' should have resulted in a new trial." Issue three lacks sufficient merit for discussion. We will discuss issues one, two and four.

## Standard of Review

[¶ 12.] We review a trial court's decision to admit other acts evidence under the abuse of discretion standard. *State v. Loftus*, 1997 SD 94, ¶ 21, 566 N.W.2d 825, 830 (citing *State v. Ondricek*, 535 N.W.2d 872, 873 (S.D.1995)). The same standard applies in reviewing a refusal of proposed jury instructions. *State v. Eagle Star*, 1996 SD 143, ¶ 13, 558 N.W.2d 70, 73 (citation omitted). "A trial court's ruling on a motion for mistrial, based on misconduct of counsel, will not be disturbed absent a clear abuse of discretion." *Robbins v. Buntrock*, 1996 SD 84, ¶ 6, 550 N.W.2d 422, 425 (citations omitted). Lastly, the clearly erroneous standard applies "when reviewing a trial court's factual determination regarding juror misconduct." *Jones v. Class*, 1998 SD 55, ¶ 12, 578 N.W.2d 154, 159 (citations omitted).

## Analysis and Decision

### A. Admission of Other Incidents

[¶ 13.] We take this opportunity to reexamine the principles applicable to other act evidence under § 19-12-5 (Rule 404(b)). In the past, we stressed that "[g]enerally, evidence of crimes or acts other than the ones with which the defendant is charged are

---

2. Instruction No. 6:
    The elements of the offense of child abuse as charged in the Information, each of which the state must prove beyond a reasonable doubt, are:
        1. That at the time and place alleged in the Information the defendant abused, tortured, tormented or cruelly punished [E.W.]; and
        2. That [E.W.] was at the time under the age of eighteen years.

Instruction No. 7:
    "Abuse" means physical maltreatment. "Torture" means to cause intense suffering to or to punish or coerce by inflicting excruciating pain. "Torment" means to cause severe and unusually persistent or recurrent distress of body or mind. "Cruelly punish" means to punish in such a way as to intentionally inflict physical suffering with reckless indifference to pain.

inadmissible, unless an exception applies." *Loftus*, 1997 SD 94, ¶ 17, 566 N.W.2d at 828 (citing *State v. Moeller*, 1996 SD 60, ¶ 12, 548 N.W.2d 465, 471 (citations omitted)); *see also* SDCL 19-12-5; *State v. Thomas*, 381 N.W.2d 232, 235 (S.D.1986). This view, that the rule is exclusionary, seems to have persisted despite the adoption of the Federal Rules of Evidence in 1978.[3] Nevertheless, though the prohibition against character evidence remains as strong as ever, § 404(b) is not a rule of exclusion. It is a rule of inclusion—no "preliminary showing is necessary before such evidence may be introduced for a proper purpose." *Huddleston v. United States*, 485 U.S. 681, 687-88, 108 S.Ct. 1496, 1500, 99 L.Ed.2d 771 (1988); *contra State v. Titus*, 426 N.W.2d 578, 579-80 (S.D. 1988). South Dakota's Professor Larson explains: "It must be remembered that FRE 404(b) is an inclusionary rule as indicated by the Advisory Committee's Note, not an exclusionary rule." John W. Larson, South Dakota Evidence § 404.2(1) (1991). "The rule establishes that such evidence is *only* inadmissible if offered to prove character." *Id.* (emphasis added). As the Advisory Committee cautioned, "it is anticipated that with respect to permissible uses of such evidence, the trial judge may exclude [similar acts] *only* on the basis of those considerations set forth in Rule 403, i.e., prejudice, confusion, or waste of time." FedREvid 404(b) Adviso-

ry Committee's Note (emphasis added) (citation omitted). *See also Huddleston*, 485 U.S. at 686-87, 108 S.Ct. at 1499-1500. *See generally* Christopher B. Mueller & Laird C. Kirkpatrick, Modern Evidence: Doctrine and Practice § 4.20, at 336 (1995).[4]

■ [¶ 14.] Because the possible uses for other act evidence are limitless, Rule 404(b) only suggests a nonexclusive list of purposes, other than character, for which they may be admissible:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

SDCL 19-12-5 (Rule 404(b)). Relevance under § 404(b) is established "only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Huddleston*, 485 U.S. at 689, 108 S.Ct. at 1501. Furthermore, the relevance of § 404(b) evidence is determined by a lower standard of proof than that required for a conviction. *Id.* at 690, 108 S.Ct. at 1501; *see* SDCL 19-9-8 (Rule 104(b)). The proponent has the burden of showing the relevance of the other crimes, wrongs, or acts. *See* SDCL 19-12-1 (Rule 401); SDCL 19-12-2

**3.** Perhaps the confusion comes partially from the title to § 19-12-5: "Evidence of other acts generally inadmissible—Exceptions." However, titles "constitute no part of any statute." SDCL 2-14-9. It should be noted, though, that at least one authority lists South Dakota as having traditionally taken the "inclusionary" approach even before the federal evidence rules were adopted. *See* Edward J. Imwinkelried, Uncharged Misconduct Evidence § 2.28, at 153 (Rev. ed. 1998) (citation omitted). The adoption of the Federal Rules should have removed all doubt. For some jurisdictions, it did not.

> Most courts construing Rule 404(b) have reached the correct conclusion that the rule incorporates the inclusionary approach. These courts have declared that the rule is "one of inclusion" designed to serve as a "broad avenue" for the admission of the defendant's uncharged misconduct. The marvel is that shortly after the enactment of the Federal Rules, a number of courts, including the Courts of Appeal for the Sixth and Eighth Circuits, occasionally treated Rule 404(b) as if it embodied the exclusionary view.

*Id.* § 2.31, at 164 (footnotes omitted).

**4.** SDCL 19-12-3 (Rule 403) and § 19-12-5 (Rule 404(b)) were adopted verbatim from the Federal Rules of Evidence. Although federal interpretations of these rules are not binding on us, it is helpful to " 'turn to the federal court decisions for guidance in their application and interpretation.' " *Sander v. Geib, Elston, Frost Prof'l Ass'n*, 506 N.W.2d 107, 122-23 (S.D.1993) (quoting *Wilson v. Great N. Ry. Co.*, 83 S.D. 207, 157 N.W.2d 19, 21 (1968); *Brasel v. Myers*, 89 S.D. 114, 229 N.W.2d 569, 570 (S.D.1975)). Furthermore, with reference to the Federal Rules of Civil Procedure we wrote in *Miller v. Hernandez*, 520 N.W.2d 266, 269 (S.D.1994), that these rules "have become similar to a uniform law." SDCL 2-14-13 states that a uniform law is to be interpreted and construed "as to effectuate its general purpose to make uniform the law of those states which enact it." We think the same may be said of the Federal Rules of Evidence, at least with respect to those rules adopted verbatim.

(Rule 402); SDCL 19–12–5 (Rule 404(b)). If the only reason for offering the evidence is to show a defendant's propensity, then it is clearly irrelevant. "In this country it is a settled and fundamental principle that persons charged with crimes must be tried for what they allegedly did, not for who they are." *Moeller*, 1996 SD 60, ¶ 6, 548 N.W.2d at 468 (citation omitted). Once the evidence is found relevant, however, the balance tips emphatically in favor of admission unless the dangers set out in Rule 403 "substantially" outweigh probative value. Imwinkelried, *supra* note 3, § 8.28, at 118–19. Before a jury may consider facts relating to other acts as proof of an issue relevant to the present offense, the jury must conclude the defendant committed the other acts by a preponderance of the evidence. *Huddleston*, 485 U.S. at 689, 108 S.Ct. at 1501. *See also State v. McDonald*, 500 N.W.2d 243, 246 (S.D.1993) (declining "clear and convincing" standard) (citing *State v. Sieler*, 397 N.W.2d 89, 93–94 (S.D.1986)).

[¶ 15.] Child injury cases are often emotion-charged. In deciding whether to admit relevant other instances of abuse under § 404(b), trial judges should cautiously balance probative value against prejudicial effect.[5] Nonetheless, § 19–12–3 (Rule 403) "favors the admission of evidence in the absence of strong considerations to the contrary." Larson, *supra*, § 403.1 (1998 Cumulative Supplement). As juries should hear all relevant evidence, judges must sparingly invoke discretion to exclude evidence under this rule. *See United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir.1984) (Rule 403 is "extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence" and "in criminal trials relevant evidence is inherently prejudicial"), *reh'g denied*, 740 F.2d 979 (11th Cir.1984), *and cert. denied sub nom. Gerwitz v. United States*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984); *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir.1983) (trial judge must take special care to use Rule 403 sparingly); *United States v. Thevis*, 665 F.2d 616, 633–34 (5th Cir.1982) (Rule 403 is "extraordinary remedy"), *reh'g*

*denied*, 671 F.2d 1379 (5th Cir.1982), *cert. denied*, 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). To exclude relevant evidence because it might also raise the forbidden character inference ignores the reality that "[a]lmost *any* bad act evidence simultaneously condemns by besmirching character and by showing one or more of 'motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident,' not to mention the 'other purposes' of which this list is meant to be illustrative." *United States v. Beasley*, 809 F.2d 1273, 1279 (7th Cir.1987) (emphasis in original). Rule 403 will not permit judges to exclude testimony in plain disbelief. *McDonald*, 500 N.W.2d at 246.

[¶ 16.] Damage to the defendant's position is no basis for exclusion; the harm must come not from prejudice, but from "unfair" prejudice. *State v. Holland*, 346 N.W.2d 302, 309 (S.D.1984); *United States v. Munoz*, 36 F.3d 1229, 1233 (1st Cir.1994), *cert. denied sub nom. Martinez v. United States*, 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1120 (1995). In truth, " '[u]nless trials are to be conducted on scenarios, on unreal facts tailored and sanitized ..., the application of Rule 403 must be cautious and sparing.' " *United States v. Rivera*, 83 F.3d 542, 547 (1st Cir.1996) (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.1979), *cert. denied* 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)). "The most striking aspect of .... [Rule 404(b) ] is its inclusive rather than exclusionary nature: should the evidence prove relevant in any other way it is admissible, subject only to the rarely invoked limitations of Rule 403." *United States v. Zeuli*, 725 F.2d 813, 816 (1st Cir.1984). "The party objecting to the admission of evidence has the burden of establishing that the trial concerns expressed in [Rule 403] substantially outweigh probative value." Larson, *supra*, § 403.1. *See also* Jane C. Hofmeyer, *A Relaxed Standard of Proof for Rule 404(b) Evidence: United States v. Huddleston*, 6 Cooley L.Rev. 79 (1989). In summary, under § 404(b) other act evidence may not be ad-

---

**5.** "Unfair prejudice," according to the Federal Advisory Committee, "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." FedREvid 403 Advisory Committee's Note.

mitted if its sole purpose is to establish an inference from bad character to criminal conduct. It is admissible when similar in nature and relevant to a material issue, and not substantially outweighed by its prejudicial impact. The degree of similarity required for other act evidence will depend on the purpose for which it is offered. With these principles, we now examine the challenged evidence.

[¶ 17.] The trial court admitted the two earlier incidents under multiple theories, some of which were not valid. But under the abuse of discretion standard, if other act evidence is admissible for any purpose other than simply character, then its use is sustainable.[6] SDCL 19-9-12 (Rule 105) (evidence may be inadmissible for one purpose but admissible for another). All that is prohibited under § 404(b) is that similar act evidence not be admitted "solely to prove character." *Huddleston*, 485 U.S. at 687, 108 S.Ct. at 1500. Here, the evidence was relevant to prove plan or design, and absence of mistake or accident. In *Ondricek*, we explained that under § 19-12-5 (Rule 404(b)), the admissibility of other acts evidence depends on a two-step analysis: (1) Whether the evidence is relevant to an issue other than character, and (2) whether "the probative value of the evidence is substantially outweighed by its prejudicial effect." 535 N.W.2d at 873; *see* SDCL 19-12-3 (Rule 403).

[¶ 18.] The term "plan" encompasses "both 'common plan, design or scheme'· and 'modus operandi' situations." *State v. Champagne*, 422 N.W.2d 840, 842 (S.D.1988). Identity was not in issue; thus, the two other abusive acts against the chil-

dren were not relevant to prove a modus operandi. In any event, modus operandi evidence used to establish identity requires a high degree of similarity. But close similarity is not required of common plan or scheme evidence, if it is not used to prove identity. As the California Supreme Court made clear, "Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense." *People v. Ewoldt*, 7 Cal.4th 380, 27 Cal. Rptr.2d 646, 659, 867 P.2d 757, 770 (1994) (en banc) (decided under California's equivalent to § 404(b)). " '[C]ommon plan, design or scheme' refers to a larger continuing plan, scheme or conspiracy of which the present crime charged at trial is only a part...." *Ondricek*, 535 N.W.2d at 875 (quoting *Champagne*, 422 N.W.2d at 842); *see also State v. White*, 538 N.W.2d 237, 243–44 (S.D.1995) (even acts occurring after the charged event are admissible under § 404(b) to show plan).

[¶ 19.] The two other acts here were admissible to establish that the defendant had a plan or design to inflict excessive punishment in a similar manner and ferocity regardless of his children's transgressions. All that is required to show a common plan is that the charged and uncharged events "have sufficient points in common." *United States v. Elizondo*, 920 F.2d 1308, 1320 (7th Cir. 1990) (citations omitted). The evidence "must demonstrate 'not merely a similarity in results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of

---

6. We encourage trial courts to avoid the "blunderbuss" approach, declaring the evidence admissible to prove any issue including motive, identity, absence of mistake, intent, or plan, without independently applying each theory to the facts. Of course, a single prior instance of misconduct may be admissible on several theories. Yet, "[i]t may be critical to distinguish between theories; the test for relevance varies with the proponent's theory, and some theories have much more stringent requirements than others. However, an act of uncharged misconduct can conceivably meet all the requirements for several theories of independent relevance." Imwinkelried, *supra* note 3, § 3.01, at 3 (footnotes omitted).

Trial courts should explain in their limiting instructions exactly the permissible and impermissible uses of the other act evidence. For example, with respect to plan or design the court might instruct as follows: This evidence, if believed, may not be used to prove defendant is a person of bad character or that defendant has a disposition to commit crime. It may be considered for the limited purpose of determining if it tends to show a characteristic plan, design or scheme that would further tend show a clear connection between the other acts and the one which the defendant is accused so that it may be inferred that if defendant committed the other acts, defendant also committed the crime charged in this case. *See* California Jury Instructions, Criminal 2.50 (1998 Revision).

which they are the individual manifestations.'" *Ewoldt*, 867 P.2d at 770, 27 Cal. Rptr.2d at 659 (quoting 2 John Henry Wigmore, Evidence in Trials at Common Law § 304, at 249 (James A. Chadbourn ed., rev. ed. 1979)). The "common features must indicate the existence of a plan rather than a series of similar spontaneous acts." *Id.* A simple showing of similar results is insufficient to establish the required connection to the present charge and the other acts. A plan or design can be shown circumstantially with evidence that the defendant committed a series of similar but "unconnected" acts. *Id.* at 768–69, 27 Cal.Rptr.2d at 659, 867 P.2d 757. Courts should allow this type of evidence only in support of consequential disputed issues. Proof of a design or plan is admissible to establish that an accused committed the charged conduct, but without high similarity it should not be allowed as a substitute for the more stringent requirements for modus operandi evidence to establish identity, nor should it be considered a blanket authorization for use to establish intent. *Id.* at 772, 27 Cal.Rptr.2d at 661, 867 P.2d 757.

[¶ 20] The issue here was punishment—was it cruel or abusive? Wright's attorney grounded his defense in SDCL 22–18–5, which authorizes parents to use reasonable and moderate force to correct their children. Thus, the degree of force in relation to the child's misconduct formed the crux of this dispute. Indeed, defense counsel argued at trial that Wright appropriately disciplined his son for starting a fire in their home, "one of the most extreme things a child can do." Referring to Wright's discipline in closing argument, his attorney told the jury, "The punishment fit the crime ." Accordingly, the jury was left to decide, under the parental discipline statute, if Wright's use of force to "restrain or correct" his son was "reasonable" and "rendered necessary by the misconduct of such child." SDCL 22–18–5.

[¶ 21.] Difficult though it is to conceive how Wright's "punishment" was reasonable, perhaps viewed in isolation, his alarmed reaction to the extreme danger of a fire in the home might raise a reasonable doubt on whether his actions were abusive under the circumstances. This makes information about the discipline of his children on other occasions

essential and relevant. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." SDCL 19–12–1 (Rule 401). Jurors could infer from Wright's two past instances of child punishment that this "discipline" was unreasonable and not "rendered necessary," but was merely part of an overall plan or design to abuse his children when given any provocation. The fact that he used equally extreme measures for minor childhood infractions, such as spilling baby powder, tends to establish a plan or design to use excessive physical force as punishment, bearing on the probability that the present discipline was unreasonable.

[¶ 22.] The two prior acts were also admissible to show absence of mistake or accident. As Wright did not testify, the jury could only draw from the circumstances themselves a sense of his state of mind when he "disciplined" his son. Whether E.W.'s injuries were unintended or inflicted cruelly and abusively remained open to inference. True, his lawyer tried to limit the issue to justified discipline, but a lawyer's remarks are not evidence. *Estes v. Millea*, 464 N.W.2d 616, 619 (S.D.1990). Even so, she told the jury that the punishment was administered when Wright's "mental state" was influenced by the fire: "it was extremely tense and frightening and scary." Juries are free to embrace, and often do, theories other than those propounded by the lawyers, so long as those theories are legitimately founded within the evidence and the law. "A plea of not guilty puts in issue every material fact constituting an offense charged in an indictment, information or complaint." SDCL 23A–22–4. The United States Supreme Court wrote in *Estelle v. McGuire*, 502 U.S. 62, 69–70, 112 S.Ct. 475, 480–81, 116 L.Ed.2d 385 (1991):

> In holding the prior injury evidence inadmissible, the Court of Appeals … relied on the theory that, because no claim was made at trial that [the victim] died accidentally, the battered child syndrome evidence was irrelevant and violative of due process. This ruling ignores the fact that the prose-

cution must prove all the elements of a criminal offense beyond a reasonable doubt.... [T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense.... The evidence of battered child syndrome was relevant to show intent, and nothing in the Due Process Clause of the Fourteenth Amendment requires the State to refrain from introducing relevant evidence simply because the defense chooses not to contest the point.

(citation omitted). Although specific intent is not an element of felony child abuse, terms like abuse, torture, and cruelly punish import a certain malicious mental state. On the other hand, argument about decisions made in tense and frightening situations suggest actions taken with inadvertent consequences.

[¶ 23.] Certainly, the use of other crimes and wrongs to show "absence of mistake or accident is well established, particularly in child abuse cases." *United States v. Harris*, 661 F.2d 138, 142 (10th Cir.1981); *People v. Henson*, 33 N.Y.2d 63, 349 N.Y.S.2d 657, 304 N.E.2d 358 (App.1973). "Where a parent uses severe corporal punishment, often the only way to determine whether the punishment is a non-criminal act of discipline that was unintentionally harsh or whether it constitutes the felony of child abuse is to look at the parent's history of disciplining the child." *State v. Taylor*, 347 Md. 363, 701 A.2d 389, 396 (Ct.App.1997). By comparison, in child sexual contact cases, we have often held that other bad acts are relevant for showing intent, even when the defendant denied any contact. *Ondricek*, 535 N.W.2d at 875; *State v. Christopherson*, 482 N.W.2d 298, 301–02 (S.D.1992); *State v. Basker*, 468 N.W.2d 413, 416 (S.D.1991); *State v. Klein*, 444 N.W.2d 16, 19 (S.D.1989); *Champagne*, 422 N.W.2d at 843; *State v. Means*, 363 N.W.2d 565, 568–69 (S.D.1985). A better reason for admitting prior acts exists in child abuse cases than in sexual contact cases because it is never claimed that sex abuse was justified. *Taylor*, 701 A.2d at 394.

Victims of child abuse often cannot speak for themselves or are very reluctant to testify unfavorably about a parent, even an abusive parent. A parent's other disciplin-

ary acts can be the most probative evidence of whether his or her disciplinary corporal punishment is imposed maliciously, with an intent to injure, or with a sincere desire to use appropriate corrective measures.

*Id.* at 396. Other courts have also concluded that prior instances of child abuse are admissible to negate an inference that the current injuries resulted from an isolated incident. *Aldridge v. State*, 398 So.2d 1308, 1312 (Miss. 1981), *rule reaff'd, Shelton v. State*, 445 So.2d 844, 848 (Miss.1984). *See People v. Taggart*, 621 P.2d 1375, 1384–85 (Colo.1981) (prior abuse admissible to show criminal culpability and negate claim of accident or justification), *rule rejected on other grounds James v. People*, 727 P.2d 850 (Colo.1986); *Mayberry v. State*, 430 So.2d 908 (Fla.Dist.Ct.App.1982) (prior abuse admissible in trial for second-degree murder and child abuse); *State v. Morosin*, 200 Neb. 62, 262 N.W.2d 194, 197 (1978).

[¶ 24.] Wright contends the incident with his daughter was too remote to be relevant. We have steadfastly refused to adopt an inflexible rule on remoteness. *State v. Wedemann*, 339 N.W.2d 112, 115 (S.D.1983) (asserted remoteness of prior acts will "realistically depend upon their nature"); *see Ondricek*, 535 N.W.2d at 877 (bad acts twenty years earlier not too remote); *Christopherson*, 482 N.W.2d at 302 (prior molestation occurring seventeen years earlier not too remote). As both prior instances of purported discipline occurred within the same familial setting, we believe the remoteness question goes more to the weight of the evidence than to its admissibility. *See generally State v. Roden*, 380 N.W.2d 669 (S.D.1986). See *State v. Hassett*, 124 Idaho 357, 859 P.2d 955, 961 (Ct.App.1993); *United States v. Hadley*, 918 F.2d 848, 851–52 (9th Cir.1990), *cert. granted*, 503 U.S. 905, 112 S.Ct. 1261, 117 L.Ed.2d 491, *and cert. dismissed*, 506 U.S. 19, 113 S.Ct. 486, 121 L.Ed.2d 324 (1992).

[¶ 25.] Without a doubt, the inclusive admissibility of other act evidence should not erode the elemental policy of protecting an accused from unfair prejudice. Four safeguards abide within the rules of evidence to deal with this problem. *See Huddleston*, 485

U.S. at 691–92, 108 S.Ct. at 1502. First, § 404(b) requires that the evidence be offered for a logically relevant purpose, other than character. Second, a jury may not consider the other acts unless it first finds by a preponderance of the evidence that the defendant in fact committed those acts. SDCL 19–9–8 (Rule 104(b)); SDCL 19–12–2 (Rule 402). Third, the trial court must determine if the probative value of the other misconduct is substantially outweighed by the potential for unfair prejudice. Fourth, the court must, when requested, explain to the jury that the other act evidence may only be considered for the purpose for which it was admitted. SDCL 19–9–12 (Rule 105).

[¶ 26.] Here, the trial court took several measures to protect the defendant. In sifting through the prosecution's offer of evidence, the court excluded four of the six prior acts the State sought to introduce. With the two remaining incidents the court determined that they were offered for a proper, relevant purpose, and they clearly were, at least with respect to the issues of absence of mistake or accident and common scheme or plan. Under § 19–12–3 (Rule 403), the court specifically found that the probative value was not substantially outweighed by the potential for unfair prejudice. Lastly, the court shielded the defendant against possible misuse of this evidence by specifically advising the jury that it was admitted only for limited purposes, and that it could not be considered "as tending to show

in any other respect the defendant's guilt of the offense with which the defendant is charged." On appeal, the burden falls on the defendant to establish prejudicial error.[7] *State v. Anderson*, 1996 SD 46, ¶ 22, 546 N.W.2d 395, 401; *State v. Fender*, 358 N.W.2d 248, 254 (S.D.1984). Considering the trial court's careful scrutiny on the questions of relevance and prejudice, we cannot say it abused its discretion in admitting this evidence.

**B. Refusal to Talk With Authorities**

[¶ 27.] Before trial, Wright moved to suppress all evidence of "[t]he defendant's invocation of his right to have an attorney[.]" His motion was granted. In their testimony, Ebach and Brubakken both referred to Wright's refusal to speak with them after learning they were investigating E.W.'s injuries.[8] Neither mentioned Wright's remark about an attorney. Wright objected to the testimony and moved the court to grant a mistrial. The court denied the motion finding that the testimony did not violate its order.

[¶ 28.] "For a violation of an in limine motion to serve as the basis for a mistrial and a later motion for a new trial, the order must be specific in its prohibition, and a violation must be clear." *Robbins*, 1996 SD 84, ¶ 6, 550 N.W.2d at 425 (citing *Kjerstad v. Ravellette Publications, Inc.*, 517 N.W.2d 419, 426 (S.D.1994)). Even when a

---

7. "On appellate review of a Rule 403 decision, a defendant must establish abuse of discretion, a standard that is not satisfied by a mere showing of some alternative means of proof that the prosecution in its broad discretion chose not to rely upon." *Old Chief v. United States*, 519 U.S. 172, 183 n. 7, 117 S.Ct. 644, 651 n. 7, 136 L.Ed.2d 574 (1997).

8. Reference to Wright's refusal to talk with Ebach came at the end of the State's direct examination:

Q [State] What was [Wright's] demeanor when he was talking to you about the fire?
A [Ebach]: He just seemed upset and angry about the fire.
Q: Did he tell you what his response was toward [E.W.] with respect to the fire?
A: No.
Q: All right. He never indicated to you any reaction that he had toward [E.W.] over the weekend?

[Wright's counsel]: Objection. Asked and answered.
THE COURT: Overruled.
A: No, he didn't want to talk to us any further.
Q: Okay. Thank you. I have nothing further.
Brubakken testified:
Q: What was the first thing you said to Mr. Wright when you arrived at the door?
A: I advised Mr. Wright that I was a social worker with Child Protection Services, and that we had received a referral with concerns regarding his son [E.W.]
Q: And what did he say to you?
A: He wanted to know who the reporting person was. At which time I told him I could not share that information, it's kept confidential by law. So he said he had nothing to say to me now.
Q: Did you have further conversation with Mr. Wright?
A: Not on that day.

violation occurs, a new trial will only be required if the violation prejudiced the party or subverted a fair trial. *Kjerstad,* 517 N.W.2d at 426 (citation omitted).

[¶ 29] Wright's refusal to speak with Ebach and Brubakken was made before his arrest, before he received his Miranda warnings, and was not used for impeachment purposes by the State. While explaining the events that led to Wright's arrest, Ebach and Brubakken only mentioned that Wright did not want to talk after being told that they were investigating E.W.'s injuries. *See Jones,* 1998 SD 55, ¶ 34, 578 N.W.2d at 164 (stating "there is no evidence in the record that the State sought to bring out this forbidden subject, directly or by allusion, by the brief reference to [the defendant's] pre-arrest silence through the detective"); *Phyle v. Leapley,* 491 N.W.2d 429, 434 (S.D.1992) (stating "[t]he circuit court found ... that the sheriff's testimony did not touch on the fact that [the defendant] invoked his right or refused to make a statement, but rather explained what happened when he arrested [him]. No constitutional procedural irregularities attended thereto").

[¶ 30.] The trial court's order prevented the State from broaching Wright's "invocation of his right to an attorney[.]" The court heard the testimony of Ebach and Brubakken. It observed the effect on the jury. It denied Wright's motion for a mistrial, finding that the testimony did not violate its order and was not prejudicial to Wright. We ordinarily defer to these rulings. *Robbins,* 1996 SD 84, ¶ 6, 550 N.W.2d at 425. Wright has not shown the trial court abused its discretion.

[¶ 31.] Defendant also claims the State indirectly alluded in its closing argument to his exercise of his right to remain silent.[9] Prosecutors are forbidden "to call attention of the jury to the failure of defendant to testify." *State v. Wilson,* 297 N.W.2d 477, 482 (S.D.1980) (citing *State v. Winckler,* 260 N.W.2d 356 (S.D.1977); *State v. Brown,* 81 S.D. 195, 132 N.W.2d 840 (S.D.1965)).

"When the comments are indirect allusions, the test is whether a reasonable intelligent jury would understand the[m] to point out defendant's failure to testify." *Id.* (citation omitted). The prosecutor's comments here rebutted Wright's closing arguments. No reasonable juror could infer these comments to be a reference to Wright's silence as an indication of his guilt. Therefore, there was no error.

## C. Juror Misconduct

[¶ 32.] Lastly, defendant claims that the trial court should have granted a new trial based on juror misconduct because a juror consulted a dictionary during the overnight break in deliberations. The court held a hearing on Wright's motion for new trial. It found that juror misconduct had occurred, but that Wright was not prejudiced.

[¶ 33.] "Even if juror misconduct occurs and warrants an inquiry, not every irregular conduct of a jury is prejudicial and warrants a new trial." *State v. Wilkins,* 536 N.W.2d 97, 99 (S.D.1995) (citations omitted). *See also Jones,* 1998 SD 55, ¶ 16, 578 N.W.2d at 160 (citations omitted). A rebuttable presumption of prejudice arises when juror misconduct occurs. *Wilkins,* 536 N.W.2d at 99. The State can rebut the presumption: (1) "[b]y showing the information was harmless in view of all the evidence of guilt"; (2) "by determining there was no significant possibility that the defendant was prejudiced"; or (3) "by showing that the nature of the extra-record evidence could not have had or had a minimal effect upon the jury[.]" *Id.* at 99–100 (citations omitted).

[¶ 34.] The trial court found that the State rebutted the presumption of prejudice. Eleven of the twelve jurors testified at the hearing. Only one juror had a question about the definition of "maltreat" and looked the word up in a dictionary during the overnight break. The jury foreperson testified that he did not recall the dictionary definition of "maltreat" being shared with the other

---

9. The State argued in its rebuttal to defense counsel's closing argument:

    She [defense counsel] said you can speculate. No, you can't. You're here to listen to the evidence and make your decision on the facts

that are presented with them today. She's standing up here, Melvin saw this. Melvin thought this. You don't know what he saw or thought. Okay.

[Objection made by defense counsel overruled.]

jurors. Eight jurors testified that they did not recall any conversations on the second day of deliberations about a juror looking up the definition. One juror testified she recalled being told someone looked up the definition of "maltreat." However, she did not remember whether she heard the definition. Each testified that the definition of "maltreat" played no part in their verdict.

[¶ 35] The trial court found that "the extraneous information had a negligible and imperceptible impact on the jury." It concluded there was "no significant probability that the defendant was prejudiced by this act of juror misconduct." Based on the strong evidence of guilt, it concluded that the misconduct was harmless. Wright has not shown that the trial court abused its discretion.

[¶ 36.] Affirmed.

[¶ 37.] MILLER, Chief Justice, and GILBERTSON, Justice, concur.

[¶ 38.] SABERS, and AMUNDSON, Justices, dissent.

SABERS, J., dissenting.

[¶ 39.] 1. If the poison of these prior bad acts has this effect upon the majority writer, a reasonably fair and objective jurist, what effect did it have on the twelve jurors in Mr. Wright's case.[10]

[¶ 40.] 2. What chance did Mr. Wright have to receive a fair trial when the jurors were judging his conduct through the poison of the prior bad acts? None or almost none.

[¶ 41.] 3. In this case, the poison of the prior bad acts dominates the trial from the outset. Mr. Wright's conviction was a foregone conclusion. If jury trials are going to be dominated by prior bad acts, why have a trial at all? If appeals are going to be dominated by prior bad acts, why not eliminate appeals and simply rubber-stamp convictions.

[¶ 42.] 4. The majority writer discourses on and on for 26 paragraphs to attempt to convey a sense of justice and fairness to these proceedings. But why? If these proceedings are dominated from the start by the poison of the prior bad acts, it makes no sense.

[¶ 43.] 5. The majority writer goes on to remind the reader that the trial court instructed the jury that the prior bad acts were only to be used for a limited purpose. Nonsense, mule muffins or horse apples as stated in *M.A.S.H.* These prior bad acts were used to poison the proceedings and the jury, from the beginning, that Mr. Wright was a bad man, who did it before and who did it again.

[¶ 44.] 6. I am not saying Mr. Wright was right, but the system was wrong to stack the deck against him and pretend to give him a "fair trial." A fair and impartial jury should have determined whether he committed the acts as charged and whether there was sufficient justification for his conduct. It did not, but it was not the jury's fault. They were poisoned from the beginning and Mr. Wright was wronged by the system. He never had a chance to get a fair trial in this case.

[¶ 45.] 7. Therefore, we should reverse and remand for a fair trial.

[¶ 46.] AMUNDSON, Justice, joins this dissent.

---

10. At this point in the proceedings, it even seems strange to me to refer to the defendant as *Mr. Wright.*