1999 SD 52

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Melvin EDELMAN, Defendant and Appellant.**

No. 20576.

Supreme Court of South Dakota.

Argued Feb. 23, 1999.

Decided April 21, 1999.

Mark Barnett, Attorney General, Paul Cremer, Assistant Attorney General, Pierre, for plaintiff and appellant.

Joseph H. Kosel, Northern Hills Public Defender's Office, Deadwood, for defendant and appellant.

GILBERTSON, Justice.

[¶ 1.] Melvin C. Edelman (Edelman) appeals his conviction of four counts of sexual contact with a minor under the age of sixteen and fifty counts of rape. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] L.B. was born in 1984. Her mother, C.W., and Edelman began a relationship in 1989 and were eventually married. Edelman lived with C.W. and her family from August 1989 to October 1997. The charges in this case arose from incidents involving Edelman sexually touching and raping L.B. These incidents were charged to have occurred from

August 1995 until October 1997. Further facts will be developed in the respective issues.

[¶ 3.] The Grand Jury returned an indictment against Edelman on November 20, 1997, charging him with four counts of sexual contact and fifty counts of rape. At the trial Stacey Anderson (Anderson), a criminalist for the State, provided serological evidence which linked Edelman to the crimes. Laurie Grossweiler (Grossweiler) provided evidence regarding DNA testing which could not exclude Edelman as a source of DNA on L.B.'s sheets. Dr. Mark Perrenoud (Perrenoud), a psychologist, testified as to the general characteristics of sexually abused children and Child Sexual Abuse Accommodation Syndrome (CSAAS).

[¶ 4.] The jury found Edelman guilty on four counts of sexual contact with a child under sixteen, SDCL 22–22–7[1] and fifty counts of rape, SDCL 22–22–1(2).[2] Edelman appeals raising the following issues:

1. Whether the testimony of the State's three expert witnesses was proper to present to the jury.

2. Whether there was sufficient evidence to convict defendant of all charges in the indictment.

## STANDARD OF REVIEW

■■■ Expert testimony admissibility is governed by SDCL 19–15–2 (Rule 702). It is well settled that the trial court has broad discretion in regard to the admission of expert testimony. *State v. Bachman,* 446 N.W.2d 271 (S.D.1989); *United States v. Purham,* 725 F.2d 450 (8thCir.1984). Absent a clear showing of abuse of discretion, the trial court's decision will not be reversed. *State v. Logue,* 372 N.W.2d 151 (S.D.1985).

1. SDCL 22–22–7 reads:

   Any person, sixteen years of age or older, who knowingly engages in sexual contact with another person ... if the other person is under the age of sixteen years is guilty of a Class 3 felony.

2. SDCL 22–22–1(2):

*State v. Raymond,* 540 N.W.2d 407, 409 (S.D. 1995).

Our standard of review of a denial of a motion for judgment of acquittal is whether State set forth sufficient evidence from which the jury could reasonably find the defendant guilty of the crime charged. *State v. Abdo,* 518 N.W.2d 223, 227 (S.D. 1994); *State v. Gallipo,* 460 N.W.2d 739, 742 (S.D.1990). In determining the sufficiency of the evidence to constitute the crime, the question is 'whether there is sufficient evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt; in making this determination, the court will accept the evidence, and the most favorable inference fairly drawn therefrom, which will support the verdict.' *State v. Heftel,* 513 N.W.2d 397, 399 (S.D. 1994) (citations omitted).

*State v. Thompson,* 1997 SD 15, ¶ 34, 560 N.W.2d 535, 542–3 (citing *State v. McGill,* 536 N.W.2d 89, 91–2 (S.D.1995)).

## ANALYSIS AND DECISION

[¶ 5.] **1. Whether the testimony of the State's three expert witnesses was proper to present to the jury.**

[¶ 6.] It is not uncommon to use experts to assist a jury in comprehending evidence presented during trial, particularly evidence such as DNA, blood or psychological evidence. SDCL 19–15–2 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

[¶ 7.] Edelman questions whether the testimony of the State's three experts was proper to present to the jury. He claims the trial

Rape is an act of sexual penetration accomplished with any person under any of the following circumstances:

...

(2) Through the use of force, coercion or threats of immediate and great bodily harm against the victim or other person within the victim's presence, accompanied by apparent power of execution[.]

court abused its discretion in allowing the testimony of each of these witnesses. We will examine the testimony of each expert below.

### [¶ 8.] a. Dr. Mark Perrenoud— Characteristics of sexually abused children

[¶ 9.] Dr. Perrenoud a psychologist from Rapid City, South Dakota, was called as a witness by the State.[3] Perrenoud has a master's degree in counseling, a doctorate in counseling/psychology and has been a licensed psychologist since 1992. His specialty is working with children and teenagers. He also spends a good part of his practice working with juvenile sexual offenders and rape victims. Prior to his testimony, he did not counsel L.B. or have any contact with her.

[¶ 10.] Edelman claims the trial court erred in allowing the testimony of Perrenoud to be presented to the jury over his objections for two reasons. First, Edelman claims a paper by Roland Summit on Child Sexual Abuse Accommodation Syndrome (CSAAS) and its conclusions, mentioned by Perrenoud, was not grounded in science but instead were a mere "intellectual exercise." Second, he claims Perrenoud's testimony improperly bolstered the credibility of L.B.'s testimony.

### [¶ 11.] i. Foundation of the CSAAS testimony

[¶ 12.] On brief and at oral arguments, counsel for Edelman took issue with Perrenoud's testimony regarding CSAAS. Counsel claims the initial report by Roland Summit that first defined CSAAS was only an "intellectual—not a scientific—endeavor" and the syndrome is not based on scientific principles and therefore was not proper expert testimony.

[¶ 13.] South Dakota has adopted the test set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) for the admission of expert scientific testimony in a criminal trial. *State v. Hofer,* 512 N.W.2d 482, 484 (S.D.1994). What is required is that

the "trial judge ... simply determine that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *State v. Moeller,* 1996 SD 60, ¶ 52, 548 N.W.2d 465, 479 (citing *Hofer,* 512 N.W.2d at 484 (other citations and internal quotations omitted)). "Pertinent evidence based upon scientifically valid principles will satisfy those demands." *Id.* Under *Daubert,* general acceptance in the scientific community is not required. *Id.*

[¶ 14.] Edelman claims the testimony concerning the CSAAS does not rest on a reliable foundation but instead is an intellectual exercise and not a scientific endeavor. Therefore, he argues the testimony by Perrenoud concerning CSAAS does not meet the *Daubert* test and the trial court should not have allowed the testimony. *Moeller,* 1996 SD 60 at ¶ 52, 548 N.W.2d at 479.

[¶ 15.] We have allowed testimony on the characteristics of child sexual assault victims. *See State v. Floody,* 481 N.W.2d 242 (S.D. 1992) (testimony of social services worker as to the characteristics of a sexually abused child did not invade the province of the jury); *State v. Spaans,* 455 N.W.2d 596 (S.D.1990) (expert testimony regarding the symptoms of child sexual abuse is permissible); *State v. Bachman,* 446 N.W.2d 271 (S.D.1989) (testimony offered to inform the jury of the characteristics displayed by one sexually abused did not reach an ultimate fact and did not invade the province of the jury and therefore met the requirements in the *Frye* test).

[¶ 16.] Contrary to what the State and the defendant's counsel said in oral arguments, the trial transcript establishes Perrenoud did not say the Roland Summit study was only "an intellectual exercise and not recognized" in his scientific community. Instead Perrenoud called the Roland Summit report a "landmark report." He did say that the report had potential for abuse and similar to any other generalization, the CSAAS concept has been overused or abused. There was no testimony by Perrenoud in which he said CSAAS is not accepted in his field.

*State v. Helmer,* 1996 SD 31, 545 N.W.2d 471.

---

3. On a previous occasion Dr. Perrenoud was called as an expert by a criminal defendant.

[¶ 17.] Moreover, we are also persuaded by the rationale of other courts who have allowed CSAAS testimony by an expert within proper limits. *See State v. Curry,* 187 Ariz. 623, 931 P.2d 1133 (App. 1996) (prosecution's expert witness testimony on CSAAS was properly admitted); *People v. Peterson,* 450 Mich. 349, 537 N.W.2d 857 (1995) (expert may testify as to similarities between the victim's behavior and other child sexual abuse victims, however, expert may not vouch for victim's veracity or testify as to defendant's guilt); *State v. J.Q.,* 252 N.J.Super. 11, 599 A.2d 172 (A.D. 1991) (psychologist testimony about child sexual abuse syndrome admissible to explain the victim's secrecy and delayed reporting but may not be used to say the child was telling the truth).[4] *State v. Doan,* 1 Neb.App. 484, 498 N.W.2d 804 (1993) ("In light of the state of social science research and case law as of this writing, we hold that CSAAS evidence is generally reliable to explain secrecy, belated disclosure and recantation by a child sex abuse victim; that syndrome evidence including CSAAS is not reliable to prove that sex abuse, in fact, occurred; and that an expert social science witness has neither the legal authority nor the scientific qualifications to opine as to the truthfulness of the statement of another witness.");*But see Commonwealth v. Evans,* 412 Pa.Super. 332, 603 A.2d 608 (1992) (admission of testimony concerning CSAAS was reversible error).

[¶ 18.] We believe Perrenoud did assist the trier of fact to understand the evidence. He educated the jury as to the general characteristics of CSAAS and he explained why these behaviors occur. The trial court did not abuse its discretion in allowing CSAAS testimony.

[¶ 19.] *ii. Perrenoud did not bolster L.B.'s credibility*

[¶ 20.] The trial court limited the scope of Perrenoud's testimony only allowing him to testify as to the general characteristics of sexually abused children. In his testimony Perrenoud stated that sexually abused children frequently shared the following characteristics: delayed disclosure of the abuse; the child may, at first, typically only disclose a small part of what occurred; the child may make some changes in its initial disclosure of the abuse; the child may have a sense of helplessness; and, the child may feel a sense of entrapment. Since L.B. displayed some of these symptoms, Edelman, claims the State manipulated the testimony of Perrenoud to say to the jury that L.B. was sexually abused. We do not agree.

[¶ 21.] This Court has placed limits on an expert's opinion in regard to the believability of child sexual abuse victims. *Raymond,* 540 N.W.2d at 409; *See also Spaans,* 455 N.W.2d at 598–9. We have said: "[t]he general rule, however, is that one witness may not testify as to another witness' credibility or truth-telling capacity because such testimony would invade the exclusive province of the jury to determine the credibility of a witness." *McCafferty v. Solem,* 449 N.W.2d 590, 592 (S.D.1989). "An expert may testify as to certain characteristics of sexually abused children and may even compare those characteristics to actions of a particular victim." *Id.* (citation omitted).

[¶ 22.] Perrenoud did not testify as to L.B.'s credibility. He did not even go so far as to compare the CSAAS characteristics with L.B.'s behavior. He did not interview or counsel L.B. He simply testified as to the general characteristics of a sexually abused child. He never stated that L.B. displayed some of these characteristics and therefore, she had been sexually abused.

[¶ 23.] The trial court carefully considered and limited the extent of Perrenoud's testimony. The court also instructed the jury they were not bound to follow the expert's testimony and they may completely disregard it, if they felt it was not credible or unreasonable. Under this standard of re-

---

4. Edelman urges that *J.Q.* stands for the proposition that CSAAS fails the test of admissibility as it has no grounds in scientific validity and has not been accepted by the scientific community. As noted above the *J.Q.* court found CSAAS testimony admissible to explain secrecy, belated disclosure and recantation by the child sex abuse victim and limited its determination that CSAAS is not reliable to attempts to prove the actual occurrence of sexual abuse and in certain instances an "opinion as to the truthfulness of a statement by another witness." 599 A.2d at 181.

view, we cannot say the trial court abused its discretion in allowing Perrenoud to testify regarding the general characteristics of sexually abused children. We affirm.

[¶ 24.] *b. Lisa Grossweiler—PCR testing*

[¶ 25.] Grossweiler, a DNA analyst at Cellmark Diagnostics in Germantown, Maryland, testified for the State as to the results of DNA testing. She was sent two cuttings from L.B.'s sheets for testing: "Cutting A" and "Cutting B." She also received a blood swatch from L.B. and Edelman. She performed a PCR test[5] on the cuttings and blood swatches.

[¶ 26.] Grossweiler testified the results of the testing on Cutting A were consistent with the DNA of L.B. Edelman was excluded as a source of the DNA on Cutting A. Grossweiler testified the data concerning Cutting B was consistent with a sample containing DNA from more than one person. L.B. could not be excluded as the primary source of DNA. Also, some of the types of DNA found were consistent with Edelman. However, those types were faint and no further conclusion could be made regarding the secondary source of DNA on Cutting B.

[¶ 27.] Seminal fluid was found on both cuttings, however, no sperm was found. This would be consistent with Edelman's seminal fluid as he had been vasectomized. Grossweiler further testified that PCR testing only allowed her to say that a person cannot be excluded as a source of DNA, it cannot identify the person as the source of the DNA. She stated her testing of Cutting B revealed, "that [Edelman] isn't excluded from the source, but whether he is definitely a source, I can't say."

[¶ 28.] Edelman claims the trial court erred in denying his motion in limine to preclude the testimony of Grossweiler. He alleges that since Grossweiler could not say the DNA found was Edelman's, then the trial court allowed the State to present testimony to the jury that carried a scientific label when in fact it was not scientific. Edelman argues because the test results from Cutting

B could not definitively reveal it was his DNA or not his DNA, the evidence did not assist the trier of fact and was prejudicial.

[¶ 29.] The justification for expert testimony is to assist the jury. *Bland v. Davison Co.,* 1997 SD 92, ¶ 30, 566 N.W.2d 452, 461. We have said:

> The determining factor in admitting expert testimony is if it would assist the jury in understanding matters that normally would not lie within a layman's breadth of knowledge. When opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time.

*Id.* (citing *Schaffer v. Edward D. Jones & Co.,* 1996 SD 94, ¶ 8, 552 N.W.2d 801, 805).

[¶ 30.] This testimony also calls for the application of the *Daubert* test. *Moeller,* 1996 SD 60 at ¶ 52, 548 N.W.2d at 479. The first step is this Court determines whether the DNA expert's testimony rests on a reliable foundation. *Id.* We have said before that PCR is a reliable method of forensic identification. *Id.* 1996 SD 60 at ¶ 69, 548 N.W.2d at 483. This brings us to the second step of the inquiry: whether this testimony is relevant to the task at hand?

[¶ 31.] Edelman claims that since the results of the DNA testing did not point to a specific conclusion of "yes it was him, or no it was not him" then it did not assist the trier of fact and further was prejudicial. Grossweiler's testimony was that Edelman could not be excluded as a source of the DNA on Cutting B. We have stated before: "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *Hofer,* 512 N.W.2d at 484 (citing *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795, 125 L.Ed.2d at 481). It did assist the jury in knowing that the DNA results of the seminal fluid found on Cutting B could not exclude Edelman. Furthermore, Grossweiler testified that Edelman was excluded as a source of the DNA found on Cutting A. This infor-

---

5. PCR testing looks at specific areas of the DNA for differences between one person to another. The examiner will compare the DNA found on the cuttings to the DNA of the samples submitted.

mation was very helpful to the trier of fact and certainly not prejudicial to Edelman.

[¶ 32.] The DNA test results presented at Edelman's trial are scientific knowledge that could clearly assist the trier of fact therefore, the test results were relevant to the task at hand. *Hofer*, 512 N.W.2d at 484. The *Daubert* standard is satisfied in this case. Furthermore, as in *Moeller*, the benefits of PCR testing extend to both the State and Edelman. 1996 SD 60 at ¶ 69, 548 N.W.2d at 483. The trial court did not abuse its discretion in allowing this testimony. We affirm.

[¶ 33.] *c. Stacey Anderson—blood type percentages*

■■■ [¶ 34.] Stacey Anderson (Anderson), a criminalist with the State forensic laboratory in Pierre who specializes in serology,[6] testified as to several items of evidence. Anderson reported that she found seminal fluid on State's exhibit number 2, L.B.'s sheet, from which the State took Cuttings A and B. When examining the cellular material removed from exhibit number 2, Anderson found an absence of sperm.[7] In her examination of Cuttings A and B, she also found a high level of P/30, a prostatic antigen, which is only produced by men. She came to the conclusion that since there was no sperm cells and a high level of seminal fluid (P/30), the fluid was from a vasectomized male or a male who was not producing sperm due to a medical condition.

[¶ 35.] Anderson also had saliva and blood samples from both L.B. and Edelman. She determined L.B. had type O[8] blood and Edelman had type AB blood. AB blood is a rare blood type. Anderson testified that only 3.9% of the Caucasian population have this blood type. She also determined that both individuals were "secretors," which meant they secrete their blood type into their other bodily fluids, if you test their saliva, semen or other bodily fluids you can pick up the blood type.[9] She determined that the blood types found on Cutting A were from a person with AB blood type and a person with O blood type. On Cutting B the blood types were also type AB and type O.

[¶ 36.] Anderson further testified as to PGM. PGM is a protein that comes in different shapes and is commonly tested to narrow down the possible sources of body fluids. After looking at the PGMs for L.B. and Edelman, Anderson determined L.B. was PGM type 1A 1B and Edelman was PGM type 1A. As to Cutting A, Anderson detected PGM 1A. She represented that because 1A was found it could mean that Edelman was the source but she could not rule out L.B. as a contributor as she also has 1A PGM. On Cutting B Anderson testified the PGM was inconclusive.

[¶ 37.] Edelman takes issue with the fact that Anderson testified from a book that only 3.9% of the Caucasian population has the rare AB blood and that she had not done any personal statistical studies herself. Edelman claims there was no foundation to qualify Anderson as an expert in the "statistics of population genetics regarding blood type percentages." Edelman's argument is without merit.

■■■ [¶ 38.] We have said: "the trial court has broad discretion in determining the qualifications of expert witnesses and in admitting expert testimony." *State v. Dirk*, 364 N.W.2d 117, 120 (S.D.1985). We find no abuse of discretion by the trial court in allowing this testimony. Anderson did establish expert qualifications in serology. Her expertise in serology would include a knowledge of blood types and their general distribution throughout the population. We affirm.

[¶ 39.] **2. Whether there was sufficient evidence to convict defendant of all charges in the indictment.**

[¶ 40.] Edelman argues the State failed to provide the jury with sufficient evidence to sustain a conviction for all counts in the indictment. Edelman was charged with four

---

6. Serology is the scientific study of blood and body fluids.

7. Again, this would be consistent with the defendant as he had been vasectomized.

8. Type O blood is also referred to as type H blood.

9. Anderson also testified that secretors represent roughly 8% of the population.

counts of sexual contact with a minor. Sexual contact is defined as:

> Any person, sixteen years of age or older, who knowingly engages in sexual contact with another person ... if the other person is under the age of sixteen years is guilty of a Class 3 felony.

SDCL 22–22–7.

[¶ 41.] There was sufficient evidence presented to the jury to find Edelman guilty on all four charges of sexual contact. For example: 1) the testimony of J.W., L.B.'s younger brother, who testified that once he entered Edelman's bedroom to retrieve a toy and saw his sister sitting on Edelman's bed with Edelman's hands "halfway up her shorts;" 2) J.W. also testified one day while he was skateboarding outside he saw through the window into L.B.'s room, Edelman putting on his shirt; 3) Edelman lived with L.B. and would baby-sit her; 4) L.B. testified that Edelman touched her chest and vagina; 5) L.B. testified that Edelman rubbed and licked her breasts; 6) L.B. testified that Edelman touched her vagina with his fingers and tongue; 7) She also stated the sexual touching lasted about five to ten minutes and occurred about five to ten times a month; 8) L.B. also testified that the touching began in August 1995 and lasted until November 1997; 9) When the incidents occurred L.B. was under the age of 16.

[¶ 42.] There was also sufficient evidence for the jury to find Edelman guilty beyond a reasonable doubt on the fifty counts of rape. Rape under SDCL 22–22–1(2) is defined as:

> Rape is an act of sexual penetration accomplished with any person under any of the following circumstances:
>
> ...

(2) Through the use of force, coercion or threats of immediate and great bodily harm against the victim or other person within the victim's presence, accompanied by apparent power of execution[.]

[¶ 43.] The State did present sufficient evidence to convict Edelman on all fifty counts of rape: 1) J.W. testified while he was skateboarding outside he saw through the widow in L.B.'s room, Edelman putting on his shirt; 2) L.B. testified that in the fall of 1996, Edelman put his penis into her vagina; 3) L.B. testified this hurt and she bled as a result; 4) L.B. testified that she did not scream or tell anyone because she was afraid of Edelman; 5) L.B. further testified that she was raped at least five times a month; 6) Grossweiler testified that Edelman could not be excluded as a source of the DNA on L.B.'s bedsheet; 7) Anderson testified that a person with AB blood was the source of the seminal fluid found on L.B.'s bedsheets, Edelman had AB blood; 8) there was testimony that the seminal fluid found on L.B.'s bedsheets was consistent with seminal fluid from a male who was not producing sperm and Edelman had been vasectomized.

[¶ 44.] In this case "there is sufficient evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *Thompson,* 1997 SD 15 at ¶ 34, 560 N.W.2d at 542 (citing *State v. McGill,* 536 N.W.2d 89, 91–2 (S.D. 1995)). We affirm.

[¶ 45.] MILLER, Chief Justice, and SABERS, AMUNDSON and KONENKAMP, Justices, concur.