2005 SD 46

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Anthony Lee REYES, Defendant and Appellant.**

**No. 23207.**

Supreme Court of South Dakota.

Considered on Briefs Feb. 15, 2005.

Decided March 30, 2005.

Lawrence E. Long, Attorney General, John M. Strohman, Assistant Attorney General, Pierre, SD, for plaintiff and appellee.

Jeremiah J. Davis, Office of the Public Defender for Pennington County, Rapid City, SD, for defendant and appellant.

ZINTER, Justice.

[¶ 1.] Anthony Reyes appeals his convictions of kidnapping, first degree rape, and sexual contact with a child under sixteen. We affirm.

### Facts and Procedural History

[¶ 2.] Anthony Reyes, 20 years old at the time of trial, lived his entire life with his mother. He had previously pleaded guilty to sexual contact with N.O., a six-

year-old boy. This case involved R.M., an eight-year-old boy.

[¶ 3.] The facts supporting the jury verdict reflect that on February 12, 2003, R.M. was walking home from school alone. He had gotten out of school at approximately 1:40 p.m., and it usually took ten or twenty minutes to get home. However, on this day, R.M. did not get home until 2:15 p.m. R.M. testified that the delay was caused by an incident with Reyes. Although R.M. had never seen Reyes before, he noticed Reyes standing in his yard. Reyes called out for R.M. to come over, but R.M. continued walking. Reyes then came out of his yard and told R.M. to "come here." R.M. testified that he told Reyes he did not want to go with him, but Reyes told R.M. to come with him into the backyard. R.M. testified Reyes further indicated that he was not going to hurt him. R.M. eventually accompanied Reyes into his backyard because Reyes "was older."

[¶ 4.] After going into the backyard, Reyes took R.M. into a shed. Once in the shed, Reyes kissed R.M., put his hand in R.M.'s pants, and "touched inside his butt." In the course of this assault, Reyes asked R.M. the specific question "why can't I rape you?" Reyes then offered to give R.M. money, a car, or a present. R.M. testified that Reyes made him promise not to tell anyone and to come back the next day. R.M. stated that he crossed his fingers because he would never keep a secret like that.

[¶ 5.] R.M. immediately ran home and told his mother what had happened. Law enforcement came to R.M.'s home and talked to him for approximately twenty minutes. A detective testified that R.M. acted bashful, embarrassed, and quiet. During the interview, R.M. identified Reyes in a photo lineup. R.M. also showed two officers where the assault had occurred.

[¶ 6.] After taking R.M. home, the two officers returned to Reyes' house. Detective Holbrook explained to Reyes and his mother that they were investigating a report they had received and that Reyes probably knew what he was talking about. Holbrook and Reyes went outside, and Reyes initially denied knowing what Holbrook was referring to. Eventually, however, Reyes said that he saw the little boy outside, but that he had not done anything to him. Reyes then became noticeably nervous and tears welled up in his eyes. Reyes also voluntarily told Holbrook that he was a registered sex offender and that he knew this incident had something to do with N.O.

[¶ 7.] Holbrook then went into the backyard and observed the shed that R.M. had described. Holbrook also observed large and small footprints in the snow. Holbrook testified that there were larger footprints between the house and the shed, and there were smaller footprints between the shed and a gate to the alley.

[¶ 8.] One week after the assault, R.M. was interviewed by Lora Hawkins, a forensic interviewer at the Child Advocacy Center of the Black Hills. The video tape of this interview, with a few redactions, was shown to the jury.

[¶ 9.] Reyes relied upon an alibi defense at trial. His mother testified that he did not leave the house the entire afternoon. She stated that Reyes had gone outside for a cigarette that afternoon, but she was sitting in the kitchen and would have seen him leave the yard or pass by the window if he had gone into the backyard. Reyes' uncle supported the alibi by testifying that he called Reyes shortly be-

fore 2:00 p.m.[1] The uncle's testimony suggested that Reyes could not have committed the offense because the uncle arrived at the Reyes' home soon after 2:00 p.m. and stayed to do some things around the house.

[¶ 10.] The jury found Reyes guilty of all three offenses. One month after the trial, and after finding corroborating records of the uncle's phone call, Reyes moved for a new trial. The motion was denied.

[¶ 11.] Reyes appeals raising the following issues:

1. Whether the trial court erred in admitting the prior sexual contact conviction involving N.O.;

2. Whether the trial court erred in allowing the jury to watch the videotaped, forensic interview of R.M. and whether the trial court erred in allowing the forensic interviewer to testify at trial;

3. Whether the trial court erred in denying Reyes' motion for a new trial following the post-trial discovery of evidence corroborating some alibi evidence;

4. Whether the evidence was sufficient to support the verdict on kidnapping.

### Decision

#### Other Acts Evidence

■ [¶ 12.] Reyes contends that the trial court erred in admitting evidence of Reyes' prior sexual contact with N.O. Reyes asserts that this evidence was used to establish that Reyes had the propensity to sexually abuse young boys, an improper purpose under SDCL 19–12–5 (Rule 404(b)).[2]

■ [¶ 13.] "In reviewing a trial court's decision to admit other acts evidence, this Court will not overrule the trial court's decision unless there is an abuse of discretion." *State v. Jolley*, 2003 SD 5, ¶ 5, 656 N.W.2d 305, 307 (citations omitted). This Court does not determine whether we would have admitted the other acts evidence, "but whether the trial court sitting in this case abused its discretion by doing so." *Id.* (citations omitted).

■ [¶ 14.] A trial court's decision to admit other acts is controlled by SDCL 19–12–5 (Rule 404(b)).

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Under this rule "the admissibility of other acts evidence depends on a two-step analysis: (1) Whether the evidence is relevant to an issue other than character, and (2) whether 'the probative value of the evidence is substantially outweighed by its prejudicial effect.'" *State v. Wright*, 1999

---

1. Reyes' mother stated that she checked the caller ID and the phone call had been received at 1:55 p.m. However, Reyes' mother indicated that the caller ID record was accidentally erased before trial.

2. Reyes contends that the other acts evidence was also improperly used during closing argument. In the argument, the State stated "[N.O.] and his parents have waited 11 months for this day.... Think about [R.M.] and think about [N.O.]"

Although this argument was improper, the trial court immediately admonished the jury stating that "[w]e're not here to decide whether [N.O.] is waiting for this day or not...." The trial court then reminded the jury of the instructions defining the permissible use of the N.O. conviction.

SD 50, ¶ 17, 593 N.W.2d 792, 800 (citation omitted). The first prong concerns factual relevancy; i.e., whether the prior acts evidence tends to make the existence of an admissible fact more or less probable. *State v. Chamley*, 1997 SD 107, ¶ 10, 568 N.W.2d 607, 611. The second prong concerns legal relevancy; i.e., "whether the probative value of the proffered evidence substantially outweighs the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." *Id.*

[¶ 15.] Because Reyes relied upon an alibi defense, identity was a fact issue in this case. As we have previously stated, "[e]vidence of prior acts similar in nature to the charged offense may be admitted where a defendant's identity is in issue." *State v. Lassiter*, 2005 SD 8, ¶ 16, 692 N.W.2d 171. *See* SDCL 19-12-5 (Rule 404(b)). The evidence is often permitted when a particular modus operandi is shown. *Lassiter*, 2005 SD 8, ¶ 16, 692 N.W.2d at 176. Under the modus operandi exception, the "acts need not be identical, but they must be of such close similarity that an inference can be drawn that the same person committed the acts." *Id.* (citing McCormick on Evidence § 190 (2d ed. 1972)).

[¶ 16.] Here, the trial court not only found similarities, but "striking" similarities in the offenses committed against N.O. and R.M.:

> The Court finds that striking similarities between the testimony of N.O. and R.M. exist. Those similarities are as follows:

both victims were boys; both victims were between the ages of seven and eight at the time the crimes were perpetrated upon them; the Defendant offered both of them money and/or a toy car; both boys were touched on their genitals and were penetrated in their rectum (although N.O. did not testify at the motion hearing that he was penetrated rectally he originally reported that he was and the Defendant so admitted to Investigator Craig Wood; see the police reports introduced at the motion hearing held on May 23, 2003.); both boys recall the Defendant saying "Why can't I rape you?"; one boy was raped near a storage shed, the other was raped in a shed.

Considering these similarities[3], the prior act relating to N.O. was factually relevant to prove identity, an issue other than character.

[¶ 17.] The prior act was also legally relevant. Once other acts evidence is found to be relevant, "the balance tips emphatically in favor of admission unless the dangers set out in Rule 403 'substantially' outweigh probative value." *Wright*, 1999 SD 50, 14, 593 N.W.2d at 799 (citation omitted). Considering the similarities previously noted, the probative value of the other act was high enough that a trial court could have concluded that it was not outweighed by the danger of unfair prejudice. Therefore, Reyes has not shown that the trial court abused its discretion in allowing use of the other act to establish identity.

---

3. Reyes disputes the similarities, relying on *Chamley*, 1997 SD 107, ¶ 15, 568 N.W.2d at 613 (stating that this Court has found reversible error when the State was allowed to introduce evidence of dissimilar sexual acts involving children). However, *Chamley* involved four other acts, only one of which this Court found to be "even remotely similar" to the current charges. *Id.* ¶¶ 14-15. Therefore, this Court concluded that, "[g]iven the lack of similarity between the prior bad acts and the charged conduct, it was error for the trial court to allow the jury to hear the prior bad acts evidence." *Id.* There was not this degree of dissimilarity in this case.

*Videotaped Interview and Testimony*
*of Forensic Interviewer*

[¶ 18.] The State was allowed to introduce a videotape of R.M.'s interview and the testimony of Lora Hawkins, the forensic interviewer. On appeal, Reyes contends that, because R.M. was available to testify, this evidence was essentially used to "bolster" R.M.'s testimony.[4]

[¶ 19.] "Decisions to admit or refuse evidence are reviewed under the abuse of discretion standard." *State v. Phair*, 2004 SD 88, ¶ 11, 684 N.W.2d 660, 664 (citation omitted). We also review the decision to allow a jury to view a videotaped interview under an abuse of discretion standard. *State v. Owens*, 2002 SD 42, ¶¶ 75–76, 643 N.W.2d 735, 754–755.

[¶ 20.] The testimony and videotape were offered under SDCL 19–16–38, a hearsay exception for statements made by young children concerning sexual abuse. That statute provides:

A statement made by a child under the age of ten, or by a child ten years of age or older who is developmentally disabled as defined in § 27B–1–3, describing any act of sexual contact or rape performed with or on the child by another, or describing any act of physical abuse or neglect of the child by another, or any act of physical abuse or neglect of another child observed by the child making the statement, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings against the defendant or in any proceeding under chapters 26–7A, 26–8A, 26–8B, and 26–8C in the courts of this state if:

(1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and

(2) The child either:

(a) Testifies at the proceedings[5]; or

(b) Is unavailable as a witness.

However, if the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

No statement may be admitted under this section unless the proponent of the statement makes known his intention to offer the statement and the particulars of it, including the name and address of the declarant to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet the statement.

*Id.*

[¶ 21.] Following a hearing, the trial court made the following relevant findings regarding admission of the evidence under this tender years statute:

● Lora Hawkins was a trained forensic interviewer.

● Ms. Hawkins met with R.M. on February 19, 2003.

● R.M. was eight years old and a third grade student at E.B. Berquist Elementary School.

4. Reyes also asserts that R.M. was not old enough to know the difference between the truth and a lie and that the forensic interviewer had to ask him questions several times before getting an inculpatory answer. These objections go to the weight, rather than the admissibility, of this evidence.

5. Because Hawkins and R.M. testified, there was no confrontation clause issue. *See State v. Carothers*, 2005 SD 16, 692 N.W.2d 544. We express no other opinion on the constitutionality of this statute under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

- Lora Hawkins testified that when R.M. was asked if he knew why he was there to see her, he said "Something bad happened to him."

- Hawkins indicated that while in the shed, the young man kissed him and that his tongue went into his mouth, and R.M. reported that the man's mouth tasted like cigarettes.

- R.M. related that the man said "Why can't I rape you?"

- R.M. told Hawkins that the man's hands went down the back of his pants and penetrated his rectum.

- R.M. also told Hawkins that the man touched his penis with his hand.

The trial court also made the following conclusions of law (some of which are findings of fact) regarding admission:

- The statements made to Hawkins were not otherwise admissible.

- The statements of R.M. described an act of rape or sexual contact perpetrated against him.

- The time, content and circumstances of the statement provided sufficient indicia of reliability.

- Proper notice had been given.

- The child was reliable as a witness; specifically, there was no indication of suggestibility. The child appeared to be cautious and careful in his answers. The child was bright and clear in speaking. The child presented with a good vocabulary. When asked to return the next day by the Defendant, the child crossed his fingers before promising to return.

- The statement was made in a controlled environment by a professional forensic interviewer.

Considering these findings and conclusions, admissibility was established under SDCL 19-16-38.

[¶ 22.] Although the evidence was admissible under this statute, Reyes contends that Hawkins' testimony was inadmissible because it was used to bolster R.M.'s credibility. We have often stated that "one witness may not testify as to another witness' credibility or truth-telling capacity because such testimony would invade the exclusive province of the jury to determine the credibility of a witness." *State v. Edelman*, 1999 SD 52, ¶ 21, 593 N.W.2d 419, 423 (citing *McCafferty v. Solem*, 449 N.W.2d 590, 592 (S.D.1989)). In this case, Reyes objects to Hawkins' testimony highlighting certain aspects of R.M.'s story:

[t]he kissing had a quality that we would say lends validity to an interview because [R.M.] spontaneously, after he had talked about the kissing, at one point he talked about the tongue —— the man's tongue going in his mouth. [R.M.] said that he tried to keep his mouth closed so that the tongue couldn't come in. He also gave what we would call a sensory detail. He talked about the man tasting like—that he tasted like he smoked or that he tasted like a cigarette.[6]

[¶ 23.] Although Hawkins' testimony was not admissible to "invade . . . the province of the jury to determine [a child's] credibility," *State v. Floody*, 481 N.W.2d 242, 249 (S.D.1992), it was admissible when reviewed in context. This testimony was actually given in response to a defense contention that R.M. had been subjected to suggestion and that his testimony had been tainted by adults. Consequently, this response was made to identify facts tending to refute the suggestion that the child's

6. Reyes did not object to this portion of Hawkins' testimony. Nevertheless, we choose to review it.

testimony had been tainted. In another case involving a statement made by a child sexual abuse victim, this Court approved similar testimony describing the *characteristics* of an abused child's story because it was "helpful to the jury in deciding whether the interviewing techniques utilized . . . were suggestive or leading." *Id.*

[¶ 24.] The same is true here. Hawkins did not testify that R.M. was credible or reliable. Rather, Hawkins only described the things that R.M. told her and the characteristics of the story that refuted the suggestion it was tainted. Therefore, the trial court did not abuse its discretion in admitting either Hawkins's testimony or her interview with R.M.

### Denial of Motion for a New Trial

■ [¶ 25.] Reyes contends that his motion for a new trial was improperly denied. Reyes' motion rested upon the post-trial discovery of telephone records that corroborated the uncle's alibi testimony concerning his 1:55 p.m. telephone call. Considering this corroborative evidence, Reyes argues that his "substantial rights were seriously harmed when his alibi defense . . . was questioned and ridiculed" by the State. "Whether a new trial should be granted is left to the sound judicial discretion of the trial court and this Court will not disturb the trial court's decision absent a clear showing of abuse of discretion." *Fechner v. Case,* 2003 SD 37, ¶ 11, 660 N.W.2d 631, 635 (citation omitted).

[¶ 26.] As a part of the alibi defense, Reyes' mother testified that Reyes did not leave the house the entire afternoon, except to go on the porch and have a cigarette. Reyes' uncle, Leon Alverson, testified that he talked to Reyes on the telephone shortly before 2:00 p.m. Alverson also testified that he went to the Reyes' home shortly after 2:00 p.m. and Reyes was on the porch smoking. The phone records discovered after trial confirmed that the call was made from Alverson's home to the Reyes' residence at 1:56 p.m. on the day in question.

[¶ 27.] Although the State knew that an alibi defense would be offered,[7] Reyes concedes that the State did not know that telephone records would be material until the defense discussed them in Reyes' opening statement. Upon learning of the materiality of the alleged telephone call, the State's attorney sought an "emergency subpoena" to obtain the telephone records. However, despite the expeditious request, the corroborative records were not produced by the phone company until after the completion of the trial.

■ [¶ 28.] Based upon these telephone records, Reyes moved for a new trial under SDCL 15–6–59(a).[8] The trial

---

7. SDCL 23A–9–1 provides:

Within the time specified in § 23A–8–4 for pretrial motions, upon written demand of the prosecuting attorney stating the time, date, and place at which the alleged offense was committed, a defendant shall serve within ten days, or at such different time as the court may direct, upon the prosecuting attorney a written notice of his intention to offer a defense of alibi. The notice shall state the specific place or places where the defendant claims he was at the time of the alleged offense and the names and address-es of the witnesses upon whom he intends to rely to establish such alibi.

8. SDCL 15–6–59(a) provides in relevant part:

A new trial may be granted to all or any of the parties and on all or part of the issues for any of the following causes:

(1) Irregularity in the proceedings of the court, jury, or adverse party or any order of the court or abuse of discretion by which either party was prevented from having a fair trial;

. . .

court considered the motion under SDCL 15-6-59(a)(4), which governs newly discovered evidence. Under subsection (4):

> [t]hose who seek another trial on after-discovered evidence must show:
>
> (1) the evidence was undiscovered by the movant at the time of trial;
>
> (2) the evidence is material, not merely cumulative or impeaching;
>
> (3) that it would probably produce an acquittal; and
>
> (4) that no lack of diligence caused the movant to fail to discover the evidence earlier.

*State v. Gehm*, 1999 SD 82, ¶ 13, 600 N.W.2d 535, 540 (citations omitted).

■■■ [¶ 29.] The trial court found no lack of due diligence in the failure to discover the phone records because even the trial court was unaware that local phone records could be recovered. However, the trial court found that the jury would not have come to a different verdict if the phone records had been introduced. The trial court noted that Alverson's testimony about the phone call was believable without the phone records. The trial court further noted that confirmation of the phone call did not make the time frame for the assault impossible. And, the trial court finally noted that the records were cumulative. In light of these findings, the trial court did not err in denying the motion under SDCL 15-6-59(a)(4).

■■■ [¶ 30.] Reyes also argues that because of the corroborating telephone records, the prosecutor's impeachment of alibi witnesses constituted an "irregularity in the proceedings" that justified a new trial under SDCL 15-6-59(a)(1). In *Fechner*, 2003 SD 37, ¶ 12, 660 N.W.2d at 635, we stated that an " 'irregularity in the proceedings' ... relates generally to departures by the court, during the trial of a case, from the due and orderly method of disposition of a case...." (Citation omitted.) "In South Dakota this concept includes misconduct on the part of the court, the attorneys, and the parties." *Id.* (internal citations omitted).

■■■ [¶ 31.] In this case, Reyes argues an irregularity because of "the conduct of the prosecutor, in simultaneously impugning the integrity of alibi testimony ... and verifying the veracity of that testimony on an expedited basis [through the issuance of the emergency subpoena]." This argument might have validity if the State had impugned the alibi testimony at a time when it knew that it was true. However, Reyes concedes that the State was only attempting to obtain the telephone records at the time of the impeachment. Thus, the State did not know that the records confirmed the uncle's testimony. Because the State did not have the "verifying" information at the time it was impeaching the alibi witnesses, Reyes may not combine these events to make it appear that the State was involved in an "irregularity in the proceedings" by discrediting a witness it knew to be truthful.

[¶ 32.] Reyes finally argues that there was an irregularity in the proceedings because of an argument made by the State in closing argument. The argument asked the jury to consider the interest that the alibi witnesses had in the outcome of the trial. The State argued:

> we did hear information from the family about what [Reyes] was doing that day. We heard it from his mother. We heard it from his uncle.... Ask yourself who is giving you this information. Where

---

(4) Newly discovered evidence, material to the party making the application, which he could not with reasonable diligence have discovered and produced at the trial;

...

are you hearing it from.... God willing my mother would alibi me if I were charged with something serious. Just ask yourself that question.

■ [¶ 33.] We observe it is generally proper argument to point out the motive and personal interest that witnesses may have in the outcome of a trial.[9] Reyes, however, argues that the last sentence of the argument, reflecting the prosecutor's hope that his mother would provide him an alibi if he were charged with something serious, was improper. Reyes points out that we have held it is improper for counsel to "state facts of his personal experience, or his own knowledge of the facts, unless he has testified thereto as a witness, or to make his argument an avenue for the presentation of unsworn testimony, or for him to insinuate that he has knowledge of facts." *Schoon v. Looby*, 2003 SD 123, ¶ 7, 670 N.W.2d 885, 888 (citation omitted).

■ [¶ 34.] In this case, the trial judge who heard the statements in context observed that the prosecutor's reference to his mother only pointed out a motive for relatives to provide favorable testimony, and the State's statement was only asking the jury to take that into consideration. We agree.

[¶ 35.] It is important to note that the prosecutor did not assert any actual

knowledge of his mother or of any trial witness. The prosecutor's reference to his mother was merely a hypothetical or analogy pointing out a hope that a mother would assist her child. Therefore, unlike *Schoon*, the State's argument here was simply asking jurors to consider the interest that this *type of witness* might have in the outcome of the case, a consideration which is permissible in determining witness's credibility or bias.

*Kidnapping*

■ [¶ 36.] Reyes argues that the trial court should have entered a judgment of acquittal because there was insufficient evidence to support the kidnapping charge.

"In determining the sufficiency of the evidence on appeal in a criminal case, the issue before this Court is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt." In making that determination, "we accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict."

*State v. Pasek*, 2004 SD 132, ¶ 7, 691 N.W.2d 301, 305 (citing *State v. Laplante*, 2002 SD 95, ¶ 19, 650 N.W.2d 305, 310).

9. The motive and personal interest of witnesses was a proper subject of consideration under jury instruction # 27, which stated:
You are the exclusive judges of all questions of fact and the credibility of the witnesses and the weight that should be given to their testimony.
In judging the credibility of the witnesses and determining the weight to be given their testimony, you may and should consider the opportunity and capacity of the several witnesses for seeing and knowing and remembering the matters about which they have testified; their conduct and demeanor while testifying, their apparent candor, fairness, bias or prejudice, if any appear; their interest or lack of interest in the result of the case; the motive, if any, actuating them as witnesses; the reasonableness of their statements, and all the evidence, facts and circumstances shown tending to shed light upon the truth or falsity of the testimony of any witness in the case and the weight to be given the testimony.
If you believe that any witness has knowingly sworn falsely to any material fact in the case, you may reject all of the testimony of any such witness.

[¶ 37.] Reyes was charged with kidnapping under SDCL 22–19–1(2), which provides:

> Any person who shall seize, confine, inveigle, decoy, abduct, or carry away any person and hold or detain such person, except in the case of an unmarried minor by a parent thereof, for any of the following reasons:
>
> . . .
>
> (2) To facilitate the commission of any felony or flight thereafter;
>
> . . .
>
> is guilty of kidnapping. . . .

Reyes argues that "there was no evidence that R.M. was seized, confined, inveigled, decoyed, abducted or carried away. Rather, R.M.'s testimony was that he willingly accompanied Reyes to the scene of the alleged crime." Reyes also argues that there was "[n]o . . . showing of physical force, actual or implied" in getting R.M. into the backyard and the shed.

[¶ 38.] However, this argument fails both factually and legally. First, Reyes' arguments fail to acknowledge that factually, the jury could have found force or fear, express or implied, in the movement of R.M. from the public sidewalk, to the alley, to the backyard, and ultimately the shed. R.M. testified that, while he was walking by Reyes' house, Reyes told him to come over. R.M. said no, and Reyes told him "I won't hurt you." Reyes then asked R.M. to come over again. This time R.M. complied with Reyes' request "[b]ecause he was older." Considering R.M.'s age and all other surrounding circumstances, the jury could have inferred that factually, this conduct involved implied physical force or fear.

[¶ 39.] Moreover, Reyes' argument fails to acknowledge that legally, physical force is not the exclusive method of kidnapping under the statute. Kidnapping may also occur by inveigling or decoying. See SDCL 22–19–1. Black's Law Dictionary (8th ed. 2004) defines decoy as "to entice (a person) without force; to inveigle." We have defined inveigle as "[t]o lure or entice or lead astray, by false representations or promises, or other deceitful means." State v. Running Bird, 2002 SD 86, ¶ 25, 649 N.W.2d 609, 614 n. 3 (citation omitted).

[¶ 40.] Thus, even if R.M. voluntarily accompanied Reyes into his backyard and shed, the jury could have found that R.M. was decoyed or inveigled into doing so. See State v. Stokes, 345 S.C. 368, 548 S.E.2d 202, 204 (S.C.2001) (finding that where decedent was tricked into going with her would-be murderers, she was "inveigled" or "decoyed," negating the voluntariness of her participation). R.M. indicated that he went with Reyes because he was older. Furthermore, R.M. did not know that Reyes was going to sexually assault him, in fact, Reyes assured him twice that he would not be hurt. Considering all the facts and circumstances, the jury could have reasonably found that R.M. was inveigled or decoyed by Reyes from the public right-of-way to the shed. Because the kidnapping could have occurred under these circumstances without physical force or fear, there was sufficient evidence to sustain the charge of kidnapping.

[¶ 41.] Reyes finally contends that "no increased risk of harm was posed by the movement from the front yard to the shed, other than the molestation and rape itself." Accordingly, Reyes argues that he could not have been convicted of kidnapping under the Curtis/Reiman test, which precludes a kidnapping conviction if it is only incidental to the underlying

rape.[10]  In *State v. Lykken,* 484 N.W.2d 869, 876 (S.D.1992), this Court discussed the *Curtis/Reiman* test in determining whether a defendant may be convicted of kidnapping and rape:

> The *Curtis/Reiman* doctrine is not meant to allow a rapist a free kidnapping because he also commits a rape.  It is meant to prevent the injustice which would occur if a defendant could be convicted of kidnapping where the only restraint utilized was that necessary to complete the act of rape.  Such brief restraint does not normally increase the victim's risk of harm over and above that already inherent in the act of rape.

*Id.* This discussion highlighted the central thesis of the *Curtis/Reiman* doctrine: the need for some increased risk of harm to sustain a kidnapping conviction.

[¶ 42.]  Here, the movement of R.M. from the sidewalk to an alley and then to the backyard and closed shed clearly increased this victim's risk of harm.  It is highly unlikely that the kissing, fondling, and rape of this child could have occurred on the sidewalk or alley near Reyes' home.  On the contrary, "most movement of rape victims by their attackers is designed to seclude the victim from possible assistance and to prevent escape—which inevitably increases the risk of harm to the victim." *Running Bird,* 2002 SD 86, ¶ 26, 649 N.W.2d at 614–615 (citing *State v. St. Cloud,* 465 N.W.2d 177, 181 (S.D.1991)).  *See also* Charles E. Torcia, Wharton's Criminal Law § 207 (15th ed. 1994 & Supp. 2005) (stating that, "[d]epending upon whether the movement of the victim is merely incidental to the commission of the crime ... of rape, the movement will or will not constitute the separate offense of kidnapping.").  Because the risk of harm to R.M. was increased by his movement from the sidewalk to the seclusion of the shed, the *Curtis/Reiman* doctrine did not preclude the kidnapping conviction.

[¶ 43.]  Affirmed.

[¶ 44.]  GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, concur.

[¶ 45.]  SABERS, Justice, concurs in part and concurs in result in part.

SABERS, Justice (concurring in result in part and concurring in part).

[¶ 46.]  I concur in result on Issues 1 and 2 and concur on Issues 3 and 4.

---

10.  *State v. Reiman,* 284 N.W.2d 860 (S.D. 1979); *State v. Curtis,* 298 N.W.2d 807 (S.D. 1980).