2005 SD 105

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**James SHAW, Defendant and Appellant.**

**No. 23153.**

Supreme Court of South Dakota.

Considered on Briefs March 21, 2005.

Reassigned June 20, 2005.

Decided Oct. 19, 2005.

Lawrence E. Long, Attorney General, Ann C. Meyer, Assistant Attorney General, Pierre, SD, for plaintiff and appellee.

Timothy J. Rensch, Rensch Law Office, Rapid City, SD, for defendant and appellant.

GILBERTSON, Chief Justice (on reassignment).

[¶ 1.] James Shaw (Shaw) appeals his conviction for attempted first degree murder and aggravated assault. We affirm.

### FACTS AND PROCEDURE

[¶ 2.] In the summer of 1999, Shaw was employed as a cook at the Crazy Horse monument in Custer County, South Dakota. The victim, J.W.H., was a minor at the time and was also employed at the monument. Both J.W.H. and Shaw were permitted to live on site in trailer houses. J.W.H. lived in a trailer along with two roommates, Joseph White Hat (White Hat) and another minor, K.D. Shaw had one roommate, Derek Pond (Pond). All the roommates either worked together or were acquainted with each other from their employment at the monument. Trouble between J.W.H. and his roommates arose

when J.W.H. was accused of taking their food and borrowing compact discs without permission. Shaw also accused J.W.H. of stealing beer from his refrigerator.

[¶ 3.] In the evening hours of July 11, 1999, the co-workers put a fund together to purchase beer for a party. Shaw and Pond left in Pond's small pickup and returned with three or four cases of beer. A carload of young people arrived shortly after, including Shaw's seventeen-year-old girlfriend R.N. A Crazy Horse security guard arrived an hour and a half into the party and advised the group that those who did not live at the trailers were to leave. The party-goers began to disperse.

[¶ 4.] Rather than end the party, Shaw, White Hat, Pond, J.W.H., K.D. and R.N. decided to take the beer and move the party to another location. Pond and White Hat rode in Pond's small pickup, while Shaw drove White's Hat's four-door white Lincoln with J.W.H, R.N. and K.D. as passengers. After driving through Custer, South Dakota, the drivers took back streets and arrived somewhere east of town before getting lost along a dirt road. After coming to a small run-off rivulet crossing the road, the beer and all the passengers were transferred to the small pickup as the white Lincoln was not suitable for off-road travel. Pond continued driving, while White Hat sat in the passenger seat. Everyone else sat in the truck bed. Pond continued to drive without knowing exactly where they were, and eventually stopped when he came to a fence that none of the occupants wanted to open. Shaw, White Hat, R.N. and K.D. exited the pickup, while Pond remained in the driver's seat listening to compact discs and talking with J.W.H., who had moved into the passenger seat.

[¶ 5.] While J.W.H. and Pond were sitting in the cab of the pickup truck, Shaw and White Hat approached. Shaw and White Hat reached into the vehicle and jerked J.W.H. out. Shaw accused J.W.H. of stealing beer from Shaw's refrigerator and punched J.W.H. in the face. Not wanting to provoke further confrontation, J.W.H. got up and returned to the cab of the truck.

[¶ 6.] Eventually the group decided to return to town because they had to work the next day. J.W.H., Shaw, White Hat, and K.D. jumped into the bed of the pickup, allowing R.N. the passenger seat. As the truck traveled back to the location of White Hat's white Lincoln, it hit a bump in the road causing J.W.H. to lose his balance. White Hat and Shaw then threw him from the back of the pickup where he landed hard on the ground and rolled into some water. J.W.H. stood up and angrily threw his soaking wet jacket into the back of the truck.

[¶ 7.] White Hat and Shaw then jumped from the bed of the pickup and began hitting J.W.H. J.W.H. testified at trial that Shaw hit him first and then White Hat hit him, knocking him to the ground. After he was down, White Hat and Shaw began repeatedly kicking J.W.H. J.W.H. curled up into a ball and put his hands over his face. Once the initial kicking attack stopped, J.W.H. moved his hands away from his face. One of the attackers then kicked him in the face and the kicking attack began anew. J.W.H. realized that a third person, K.D., had joined in the kicking during the second phase of the attack.

[¶ 8.] Once the second wave of kicking ceased, J.W.H. testified he was unable to move and remained immobilized on the ground as the three attackers walked away. J.W.H. heard Shaw and White Hat talking, and then felt both men grab him beneath his arms and drag him into the run-off rivulet the group had crossed earlier. The two assailants then dropped

J.W.H. face first into the water. One of the assailants then ground J.W.H.'s face into the bottom of the pool of water, allowed him to surface and then pushed his face back under the water.

[¶ 9.] The attackers then walked away from their victim, only to come back a few minutes later. J.W.H. testified he heard two people coming toward him, who then grabbed the back of his head and pulled him out of the water. J.W.H. then testified he felt a "sharp pain" on the side of his neck which felt like he had been stabbed with a needle-like object. The attackers then flopped J.W.H.'s head back into the water and walked away.

[¶ 10.] J.W.H. testified that as the attackers walked away from him, he heard Shaw say "well, he's way out here [and] no one is going to find him." To which J.W.H. testified he heard White Hat reply "he's dead, [c]ome on, [and] let's go." J.W.H. testified he heard someone say "check if he's dead." J.W.H. played dead in order to avoid further injury. J.W.H. also testified he believed Pond had come back to check on him, picked up his head and exclaimed "Oh my God."

[¶ 11.] Once J.W.H. heard everyone leave, he pulled himself out of the water and onto dry ground. J.W.H. began shivering with cold, and grabbed his neck where it was hurting. He then noticed a two-lane trail and followed it for over two miles until he reached a ranch house. The residents of the ranch house provided J.W.H. with basic aid for the deep slash in his throat. J.W.H. was transported to a local hospital where he named his attackers to police as White Hat and Shaw. J.W.H.'s injuries included hypothermia, a probable concussion, a deep neck wound

that exposed his pulsating carotid artery and several large veins, a laceration on the top of his head, as well as scattered cuts and abrasions on his body. The neck wound required suturing in layers, and the head laceration had to be stapled shut.

[¶ 12.] Several hours later, the individuals involved were arrested. At the time of his arrest, Shaw had J.W.H.'s blood on his pants and wet shoes. Shaw and White Hat blamed each other for slashing J.W.H.'s throat. White Hat ultimately pleaded guilty to attempted first degree murder.

[¶ 13.] Shaw was charged with alternate counts of attempted first degree murder and attempted second degree murder, as well as aggravated assault. A Part II Information was filed against Shaw due to a prior escape conviction. Under a plea agreement with the State, Shaw agreed to plead guilty to aggravated assault in exchange for the dismissal of the attempted murder charge and the Part II Information. However, contrary to the plea agreement, the State asked for the maximum penalty on the aggravated assault charge after it had agreed to remain silent as to the sentence. Shaw was sentenced to fifteen years in the state penitentiary.

[¶ 14.] Shaw filed an application for Writ of Habeas Corpus alleging a violation of due process and ineffective assistance of counsel because the State violated the plea agreement. The habeas court vacated the fifteen-year sentence and the judgment of conviction. The parties stipulated to the withdrawal of the plea agreement.

[¶ 15.] The State amended its complaint against Shaw, charging him with attempted first degree murder under SDCL 22–16–4 [1] and 22–4–1(1) [2] and ag-

---

1. SDCL 22–16–4 provides in relevant part: "Homicide is murder in the first degree when perpetrated without authority of law and with a premeditated design to effect the death of

the person killed or of any other human being[.]"

2. SDCL 22–4–1(1) provides in relevant part:

gravated assault under SDCL 22–18–1.1(1),[3] along with being a habitual offender in a Part II Information. Trial on the matter was held before a jury on November 5, 2003. Shaw was found guilty of attempted first degree murder and aggravated assault, and pleaded guilty to the Part II Information. Shaw was sentenced to sixty years in the state penitentiary on the attempted first degree murder conviction, with thirty-five years suspended. He was sentenced to twenty-five years in the state penitentiary on the aggravated assault conviction, with ten years suspended. The trial court imposed consecutive sentences.

[¶ 16.] Several days after the conviction, defense counsel moved for a new trial after discovering a written statement by White Hat claiming that Shaw did not know of, and had nothing to do with, the attempted murder of J.W.H. The trial court denied the motion.

[¶ 17.] Shaw appeals, raising the following issues:

1. Whether the trial court erred when it refused to instruct the jury that the victim's prior inconsistent statements could be used as substantive proof of the matter asserted.

2. Whether there was sufficient evidence to support the convictions.

3. Whether the trial court erred in refusing to grant a new trial when

alleged exculpatory evidence was discovered after trial.

### STANDARD OF REVIEW

[¶ 18.] The standard of review for a trial court's denial of a proposed jury instruction is well settled. *State v. Martin*, 2004 SD 82, ¶ 21, 683 N.W.2d 399, 406.

We review a trial court's refusal of a proposed instruction under an abuse of discretion standard. The trial court has broad discretion in instructing the jury. Jury instructions are satisfactory when, considered as a whole, they properly state the applicable law and inform the jury. Error in declining to apply a proposed instruction is reversible only if it is prejudicial, and the defendant has the burden of proving any prejudice.

*Id.* (quoting *State v. Webster*, 2001 SD 141, ¶ 7, 637 N.W.2d 392, 394). "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." *State v. Henry*, 1996 SD 108, ¶ 10, 554 N.W.2d 472, 473 (quoting *State v. Moriarty*, 501 N.W.2d 352, 355 (S.D.1993); *State v. Devall*, 489 N.W.2d 371, 374 (S.D.1992)). "An erroneous instruction is prejudicial if in all probability it produced some effect upon the verdict and is harmful to the substantial rights of the party assigning it." *First Premier Bank v. Kolcraft En-*

---

Any person who attempts to commit a crime and in the attempt does any act toward the commission of the crime, but fails or is prevented or intercepted in the perpetration thereof, is punishable where no provision is made by law for the punishment of such attempt, as follows:

(1) If the attempted crime is punishable by imprisonment in the state penitentiary for five years or more, or by imprisonment in a county jail, the person guilty of such attempt is punishable by imprisonment in the state penitentiary or in a county jail, as the case may be, for a term not exceed-

ing one-half the longest term of imprisonment prescribed upon a conviction for the attempted crime[.]

3. SDCL 22–18–1.1(1) provides in relevant part:

Any person who:
(1) Attempts to cause serious bodily injury to another, or causes such injury, under circumstances manifesting extreme indifference to the value of human life; ... is guilty of aggravated assault. Aggravated assault is a Class 3 felony.

*terprises, Inc.,* 2004 SD 92, ¶ 40, 686 N.W.2d 430, 448 (citing *Carpenter v. City of Belle Fourche,* 2000 SD 55, 609 N.W.2d 751).

[¶ 19.] "In determining the sufficiency of evidence on review, the question presented is whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *State v. Buchholz,* 1999 SD 110, ¶ 33, 598 N.W.2d 899, 905 (quoting *State v. Knecht,* 1997 SD 53, ¶ 22, 563 N.W.2d 413, 421). On review, we accept the evidence and the most favorable inferences that can be fairly drawn from it that support the verdict. *Id.* We will not engage in resolving conflicts in the evidence, passing on the credibility of witnesses, or reweighing the evidence. *Id.* "No guilty verdict will be set aside if the evidence, including circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt." *Id.*

[¶ 20.] The abuse of discretion standard is also applied by this Court when reviewing the trial court's denial of a motion for a new trial. *Christenson v. Bergeson,* 2004 SD 113, ¶ 13, 688 N.W.2d 421, 426 (citing *Olson v. Judd,* 534 N.W.2d 850, 852 (S.D.1995) (citing *Treib v. Kern,* 513 N.W.2d 908, 911 (S.D.1994))). Absent an abuse of discretion, we will not reverse the trial court's decision to grant or deny a new trial. *Id.* (citing *Maybee v. Jacobs Motor Co.,* 519 N.W.2d 341, 344 (S.D. 1994)).

## ANALYSIS AND DECISION

[¶ 21.] **1. Whether the trial court erred when it refused to instruct the jury that the victim's prior inconsistent statements could be used as substantive proof of the matter asserted.**

[¶ 22.] At trial, the defense proposed Criminal Pattern Jury Instruction 1–15–9,

excluding the last clause in parentheses. The instruction provides:

> The credibility of a witness may be attacked by introducing evidence that on some former occasion the witness made a statement on a matter of fact or acted in a manner inconsistent with the witness' testimony in this case on a matter material to the issues. Evidence of this kind may be considered by you in connection with all the other facts and circumstances in evidence in deciding the weight to be given to the testimony of that witness, **(but you must not consider any such prior statement as establishing the truth of any fact contained in that statement.)**

Criminal Pattern Jury Instruction 1–15–9 (emphasis added). The defense sought to exclude the last clause of the jury instruction and have J.W.H.'s prior inconsistent statements used as substantive evidence that it was White Hat and not Shaw that had slit J.W.H.'s throat. The defense also sought to have Shaw's statements made during the police interview admitted under SDCL 19–16–2(3), as statements "of identification of a person made after perceiving him." The trial court refused, and used the full jury instruction. Shaw claims this was error as the statements were not hearsay under SDCL 19–16–2(1) and (3). Shaw further claims the trial court's error prejudiced him, as the ruling prevented the jury from considering J.W.H.'s prior statements as exculpable evidence, a theory central to Shaw's defense.

[¶ 23.] "A trial court is required to instruct on the law *only* when there exists [competent] evidence on the record upon which such instruction can be based." *Miller v. State,* 338 N.W.2d 673, 676 (S.D. 1983) (citing *State v. Bean,* 265 N.W.2d 886 (S.D.1978)) (emphasis added). In the instant case, the issue turns on whether

J.W.H.'s out-of-court statements to police during his interview qualify as not-hearsay statements of identification for purposes of SDCL 19–16–2(3), and whether J.W.H.'s preliminary hearing testimony is inconsistent with his trial testimony such that his statements are not hearsay and admissible under SDCL 19–16–2(1).

## Are Statements of "Identification" Made During Police Interview Admissible under SDCL 19–16–2(3)

▮ [¶ 24.] At Shaw's trial during cross-examination, defense counsel impeached J.W.H. with statements he made during a police interview ten days after the

attack, in which he said that it was White Hat who had held his head under the water, and White Hat who had grabbed the back of his head and cut his throat. During his direct examination by the State, J.W.H. testified that "they" had held him under the water and that "they" had grabbed him by the back of the head and cut his throat. J.W.H. also testified at trial that it was Shaw who had made the comment to the effect that because of the remote location no one would ever find him. J.W.H. was again properly impeached at trial when he conceded that he had told police it was White Hat who had made the remark.[4]

4. At Shaw's trial, J.W.H was asked by defense counsel on cross-examination if he had ever seen a transcript of his interview with police on July 22, 1999. Defense counsel then proceeded to impeach J.W.H. using the statements he made to the police on that date, focusing on inconsistencies with his direct testimony during the trial:

Q: (By Mr. Rensch) All right. I want to ask you if you were asked this and if you gave this answer. Question by Deputy Baker, "What happened after they were kicking you?" Answer, "Um they got done, I was laying there, I was too sore to move, I hurt, I just laid there, and Shaw and Joe [White Hat] picked me up underneath each arm and drug me into the water and dropped me in the water and I am pretty sure it was Joe [White Hat] that stepped on my head and pushed my head underneath the water." Did you give that answer to that question, Sir?

A: Yes, I did.

Q: Okay. And I want to ask you if you were asked this question and gave this answer, same page. Mr. Vander Heide: What page is that? Mr. Rensch: 8 from the back.

Q: (By Mr. Rensch) "How long was your head under the water?" Answer, "20 to 25 seconds." Question, "And this whole 20 to 25 seconds your head was being held under the water?" Answer, "Yes, it was." Question, "Do you know by who?" Answer, "By Joe [White Hat]." Did you give those answers to those questions, sir?

A: If that's what it says.

J.W.H. further testified:

Q: (By Mr. Rensch) You just told us that you don't know who cut your throat and I want to ask if you were asked these questions and gave these answers. Question, by Deputy Baker, "Okay, so you know it was Joe [White Hat] that cut your throat?" Answer, "Yes." Question, "You're absolutely positive?" Answer, "Yes." Question, "And he did it on his own?" Answer, "Yes." Did you give those answers to those questions?

A: If that's what it says, yes.

Q: Do you want to look at it so we can make sure you know what it says?

A: No.

. . .

Q: (By Mr. Rensch) Were you asked these questions and did you give these answers? Question, "Nobody else grabbed you by the back of the head and pulled your head up while he cut your throat?" Answer, "No. It was just him." Question, "And again, tell me how far was Shaw away when Joe [White Hat] cut your throat?" Answer, "About 15 yards away." Did you give those answers to those questions, sir?

A: If that's what is says, yes.

J.W.H.'s final statement focused on by the defense as a statement of identification was as follows:

Q: (By Mr. Rensch) Question, by the deputy, "Do you remember what they said?" You said, "Um they said, well, they'll

[¶ 25.] Shaw argues that the statements given by J.W.H. to police during an interview ten days after the assault meet the requirements of SDCL 19–16–2(3). Shaw further argues these statements should have been admitted as substantive evidence of White Hat's role in the assault and attempted murder, and to support the defense's theory that Shaw was a bystander and lacked the requisite intent for the attempted murder charge.

[¶ 26.] SDCL 19–16–2(3) provides in relevant part: "A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is: (3) [o]ne of identification of a person made after perceiving him." SDCL 19–16–2(3) closely patterns Federal Rule of Evidence 801(d)(1)(C).[5] *State v. McCafferty*, 356 N.W.2d 159, 161 (S.D. 1984) (noting South Dakota hearsay rules closely pattern Federal Rules of Evidence 801 to 806 inclusive). The legislative history of FRE 801(d)(1)(C) is therefore instructive for our rule version of the non-hearsay rule under SDCL 19–16–2(3). In addition, decisions by Federal courts concerning the application of the Federal Rules of Evidence provide analytical assistance in the interpretation of our state rules of evidence. *See Miller v. Hernandez*, 520 N.W.2d 266, 269 (S.D.1994).

[¶ 27.] The legislative history of FRE 801(d)(1)(C) makes it clear the rule is intended to apply to out-of-court identification procedures such as line-ups, show-ups and displays of photographs, that must comport with the due process standard of the Fifth and Fourteenth Amendments to the United States Constitution in order to be admissible under the rule. H.R. Rep. No. 94–355 at 2, *as reprinted in* 94th Cong. 1st Sess., 1975 U.S.Code Cong. & Admin.News 1092, 1093 (citing *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) (preindictment line-up); *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) (preindictment line-up followed by face-to-face show-up); *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (one-person show-up); *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (photographic identification used the day after the alleged crime)). The rationale for the rule is that courtroom identification can be very suggestive as the defendant is known to be present and generally sits in a specific location in the courtroom, while out-of-court identifications are generally more reliable. *Id.* at 3, 1975 U.S.Code Cong. & Admin.News at 1094. In addition, an early out-of-court identification provides fairness to the defendant by ensuring accuracy of the identification before witnesses' memories fade. *Id.*

[¶ 28.] Few cases have addressed the issue of when an out-of-court statement of identification meets the requirements of FRE 801(d)(1)(C) such that it is not hearsay and may be admitted as substantive evidence. In *United States v. Thomas*, 41 M.J. 732 (N.M.Ct.Crim.App.1994), the Government sought to introduce out-of-court statements made by a witness outside the context of a line-up, show-up, or photographic identification procedure as not-hearsay statements of identification

---

never find him. He's out here." Question, "Do you remember who said that?" Answer, "Joe [White Hat] did."

A: (By [J.W.H.]) If that's what it has, that's what I said.

**5.** FRE 801(d)(1)(C) provides in relevant part: "A statement is not hearsay if . . . The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (C) one of identification of a person made after perceiving the person[.]"

under Military Rule of Evid, 801(d)(1)(C). Military Rule of Evid, 801(d)(1)(C) is taken verbatim from FRE 801(d)(1)(C). *Id.* at 734. The U.S. Navy–Marine Corps Court of Criminal Appeals held that the Government's attempt to bolster a witness's testimony by such an out-of-court statement was not permitted under the rule, as the intent of the rule was to make it clear that *nonsuggestive line-ups, show-ups, and photographic arrays and other identification procedures are not hearsay and therefore admissible. Id.* at 735. That court held that Mil.R.Evid, 801(d)(1)(C), or FRE 801(d)(1)(C), did not apply to prior consistent statements of a witness not conducted at such an identification procedure, and introduced merely to bolster the witness' in-court testimony. *Id.*

[¶ 29.] The court in *United States v. Kaquatosh,* 242 FSupp2d 562, 565 (E.D.Wis.2003), used similar rationale for not admitting out-of-court statements made to a police officer during an interview under FRE 801(d)(1)(C). The language of FRE 801(d)(1)(C) "made after perceiving him," refers to a witness recognizing the defendant after a subsequent observation and identifying the defendant. *Id.* This requires the witness to make the statement of identification after observing or perceiving the defendant in person for a second time at a hearing, line-up or show-up, or from a likeness in a photo array, after the initial observation of the defendant at the time of the incident in question. *Id.* Out-of-court statements made during a police interview are more properly characterized as accusatory statements rather than statements of identification for purposes of FRE 801(d)(1)(C). *Id.*

[¶ 30.] Only the Third Circuit Court of Appeals and District of Columbia Circuit Court of Appeals have affirmed the admission of such accusatory or interview statements under FRE 801(d)(1)(C). *See United States v. Lopez,* 271 F.3d 472, 485 (3rd Cir.2001); *United States v. Davis,* 337 U.S.App.D.C. 36, 181 F.3rd 147, 149 (D.C.Cir.1999); and *United States v. Brink,* 39 F.3d 419, 426 (3rd Cir.1994). However, these courts did not provide rationale other than to state that the evidence was admissible without further explanation. *See, e.g., Lopez,* 271 F.3d at 485 (stating "[c]ertainly the purpose of the Rule seems to be fulfilled here[.]").

[¶ 31.] We find the *Thomas* and *Kaquatosh* decisions persuasive. SDCL 19–16–2(3) applies only to statements of identification made at an identification procedure conducted by police such as a photographic array, show-up or line-up. A line-up or other identification procedure to "identify" suspects involved in the assault did not occur in this case. The trial court did not err when it held that J.W.H.'s statements made in a police interview did not qualify as not-hearsay statements of identification within the meaning of SDCL 19–16–2(3), and therefore were not admissible as substantive evidence.

**Prior Inconsistent Statement Under Oath, SDCL 19–16–2(1)**

[¶ 32.] J.W.H. testified at the preliminary hearing, while under oath and subject to cross-examination, that he did not know who was kicking him. However, at trial, the victim testified that both White Hat and Shaw kicked him. J.W.H. testified at the preliminary hearing that Shaw was fifteen yards behind him when his throat was slit, while at trial he stated that Shaw was standing at his feet when it occurred. Shaw maintains that these inconsistent statements were not hearsay and admissible as substantive evidence for the truth of the matter asserted as prior inconsistent statements made under oath per SDCL 19–16–2(1).

[¶ 33.] The relevant preliminary hearing testimony Shaw relies upon for this argument is as follows:

[Victim:] I hit into the ground and rolled into some water and I was all wet and I stood up. I had a black jacket on. I took that off and I was cussing around and I threw my jacket in the back of the pickup.

[State:] Uh-huh.

[Victim:] And Joe and Shaw both jumped out again. As I stepped away from the vehicle I couldn't really tell which one was closer. I think it was Shaw that was closer. He had a dark colored shirt on and Joe had a light colored shirt on.

. . . .

And I guess Shaw was closer than I thought he was. He was the one who hit me first.

[State:] So he hit you again at that point?

[Victim:] Yes.

[State:] And then what happened?

[Victim:] I took a few steps backwards, and Joe was the one who hit me second and put me down on the ground.

[State:] Okay. And then what happened?

[Victim:] And I remember him saying, "Don't ever do this," and he started kicking me. There was two of them at that time kicking me.

[State:] And they were the two there, Joe White Hat and Shaw is who you've been talking about?

[Victim:] Yes, those were there and both kicking me. I just put my hands over my face to cover my face and I just laid there. I tried to move—they stopped so I moved, and I guess [KD] came up. There was one standing above me and one in front of me and one behind me and they all started kicking me.

On cross-examination during the preliminary hearing, the victim proceeded in his testimony:

[Defense:] Now in answer to [the State's] question, you said you don't know, it was dark, you're not sure who was doing what; is that right?

[Victim:] Yes.

[Defense:] Okay. But you know that Joe [White Hat] hit you once and that's when you went down?

[Victim:] Yes.

[Defense:] And then you said later on that people were kicking you, but you don't know for sure who was doing what?

[Victim:] I did not know who was kicking me at the time.

[Defense:] And you couldn't identify who was doing what to you?

[Victim:] No.

[¶ 34.] The victim concluded his preliminary hearing testimony with the State's redirect examination, in which counsel inquired: "And there was a time [the defense] kind of indicated that Joe [White Hat] was the one that hit and kicked you. And I recall that you said that Shaw did that as well, is that correct?" The victim answered "[y]es."

[¶ 35.] At trial, the victim testified again to the beating he sustained:

[Victim:] James Shaw, he hits me once and then Joseph White Hat hits me and knocks me down. I go down onto the ground.

[State:] And then what happened?

[Victim:] And then as I lay there, I am trying to get up and all I heard was Joseph White Hat say, don't ever—and then the kicking started. But James Shaw was standing in front of me on this side (indicating). I was curled up and Joseph White Hat was in back of me and

they were just kicking me and kicking me. I curled up and covered my face.

The kicking stopped. So I pulled my hands down and someone kicked me in the face, so I covered back up and then the kicking started again, but this time there was three of them.

[State:] Did you recognize who the third person was who joined them?

[Victim:] Yes. [KD].

[¶ 36.] SDCL 19–16–2(1) provides in relevant part:

A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

(1) Inconsistent with his testimony and was given under oath and subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition[.]

The rule does not provide a definition of the term "inconsistency." However, other courts that have addressed the issue have noted that "[t]he trial judge has considerable discretion in determining whether testimony is 'inconsistent' with prior statements; inconsistency is not limited to diametrically opposed answers but may be found in evasive answers, inability to recall, silence, or changes of position." *United States v. Russell*, 712 F.2d 1256, 1258 (8th Cir.1983) (quoting *United States v. Dennis*, 625 F.2d 782, 795 (8th Cir. 1980); citing *United States v. Rogers*, 549 F.2d 490, 495–96 (8th Cir.1976), *cert denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977)).

[¶ 37.] In the instant case, the circuit court instructed the jury using Criminal Pattern Jury Instruction 1–15–9, including the clause precluding the jury from considering any prior statement as substantive evidence. In support of its decision not to admit the victim's statements about being kicked as substantive evidence under SDCL 19–16–2(1), the court stated:

The suggestion through the course of questioning that in the preliminary hearing that he could not and did not identify Mr. Shaw as one who kicked him is inaccurate—known to both counsel and the Court to be inaccurate and the Court is not going to let it stand as evidence to that effect.

. . . .

Early in his testimony he indicates that both of them were kicking him. He believed it was both of them who were kicking him and that's entirely—it's consistent with the defendant's statement. The only question is how many times.

Although inconsistencies may arise through a witness's "evasive answers, inability to recall, silence, or changes of position," such was not the case with the victim's trial testimony here. *See United States v. Matlock*, 109 F.3d 1313, 1319 (8th Cir.1997) (quoting *Russell*, 712 F.2d at 1258). Thus, the circuit court properly instructed the jury after finding that the victim's statements were admissible for impeachment purposes only, and not for the truth of the matter asserted.

[¶ 38.] Shaw also argues that the statements of identification given to police discussed above, which are more properly characterized as accusatory statements, may also be admissible under SDCL 19–16–2(1) as prior inconsistent testimony. Shaw's argument would require this Court to accept that the statements of identification given without benefit of oath or cross-examination can be transformed into substantive evidence at trial, if those statements of identification are the subject of impeached testimony at a preliminary hearing where the declarant was under oath and subject to cross-examination. Shaw, again, provides no authority for this proposition.

[¶ 39.] J.W.H. did not endorse or concede the accuracy of his statements in the police interview during the preliminary hearing. J.W.H. merely acknowledged that he made the inconsistent statements. Lacking endorsement or a concession about their accuracy, these police interview statements cannot be considered later at trial under SDCL 19–16–2(1) as not-hearsay.

[¶ 40.] In order to allow Shaw's argument with regard to these accusatory statements to prevail, this Court would have to ignore the plain and unambiguous language of SDCL 19–16–2(1), and permit the usage of subsection (3) to evade the requirements of subsection (1). In effect, it would require this Court to nullify the requirement of using only prior statements given under oath and subject to cross-examination. As long as a crime was committed and as long as the witness accuses a particular individual, the statement's content would be received as substantive evidence. Such an interpretation was not the intent of the rule.

[¶ 41.] The trial court did not abuse its discretion when it held that the prior testimony given by J.W.H. was not inconsistent within his testimony at trial, such that it could be admitted as substantive evidence under SDCL 19–16–2(1). Nor did the trial court err when it held the prior accusatory statements, labeled as statements of identification by Shaw, were not admissible under either SDCL 19–16–2(1) or (3). Therefore, the trial court did not err when it used Jury Instruction 1–15–9 in its entirety, including the last sentence (but you must not consider any such prior statement as establishing the truth of any fact contained in that statement), as there was no competent evidence in the record to support instructing the jury to consider as substantive evidence J.W.H.'s conflicting testimony concerning Shaw's role in the attack.

[¶ 42.] **2. Whether there was sufficient evidence to support the convictions.**

[¶ 43.] Shaw argues that J.W.H.'s testimony casts substantial doubt as to Shaw's role in the assault, and does not provide evidence of specific intent to kill. Shaw points to the following testimony by J.W.H. to support his argument that the jury could not convict Shaw without evidence of the specific injuries he inflicted on the victim:

[Defense:] And then you said later on that people were kicking you, but you don't know for sure who was doing what?

[Victim:] I did not know who was kicking me at the time.

[Defense:] And you couldn't identify who was doing what to you?

[Victim:] No.

[¶ 44.] As this Court held in *State v. Buchholz*, 1999 SD 110, ¶ 33, 598 N.W.2d at 905:

In determining the sufficiency of the evidence on review, the question presented is whether there is evidence in the record which, if believed by the fact finder, is sufficient to sustain a finding of guilt beyond a reasonable doubt. In this review, we must accept that evidence, and the most favorable inferences to be fairly drawn therefrom, which will support the verdict. In determining the sufficiency of the evidence, this Court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence. No guilty verdict will be set aside if the evidence, including circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt.

(quoting *Knecht,* 1997 SD 53, ¶ 22, 563 N.W.2d at 421).

[¶ 45.] "All elements of a crime, including intent . . ., may be established circumstantially." *State v. Guthrie,* 2001 SD 61, ¶ 48, 627 N.W.2d 401, 421 (citing *State v. Holzer,* 2000 SD 75, ¶ 15, 611 N.W.2d 647, 651). The State is not required "to exclude every hypothesis of innocence" in order to support a conviction based circumstantial evidence. *Id.* ¶ 49 (citing *State v. Ashley,* 459 N.W.2d 828, 832 (S.D.1990)). Instead, this Court is required to "review the evidence cumulatively to see whether in its totality it is enough to rule out any reasonable hypothesis of innocence." *Id.* (citing *State v. Hage,* 532 N.W.2d 406, 411 (S.D.1995)).

[¶ 46.] Shaw argues that J.W.H. was unable to identify him as one of the attackers. Shaw contends that J.W.H.'s testimony ultimately places Shaw just standing at the scene of the attack. Shaw further argues that there is no evidence in the record to support the State's contention that Shaw inflicted grievous bodily harm upon J.W.H., or intended to kill him. Shaw's arguments fail.

[¶ 47.] The record contains evidence that J.W.H. testified he remembered Shaw and White Hat throwing him from the truck bed, and then both men began kicking him. J.W.H. also testified he knew that Shaw was kicking him during the assault, as he could hear Shaw as he grunted and moaned during the attack. J.W.H. was unable to determine which assailant landed which blows, but he was certain that both Shaw and White Hat participated in both kicking attacks. Also, Shaw himself admitted to police in one of his interviews that he had kicked J.W.H. twice. In addition, the videotaped testimony of Stacey J. Smith, a Criminalist with the State of South Dakota Forensic Laboratory, was entered into evidence. Smith testified that the blood found on Shaw's pants was DNA matched to J.W.H.

[¶ 48.] Given the evidence contained in the record of the injuries sustained by J.W.H. as a result of the attack, and its most favorable inferences, there is sufficient evidence to support the conviction on the aggravated assault charge. There was sufficient evidence in the record for the jury to find that grievous bodily injury was inflicted upon J.W.H. and that Shaw was an active participant in the attacks that inflicted those injuries.

[¶ 49.] At trial and at the preliminary hearing, the victim identified Shaw as one of the attackers who dragged him into the water and attempted to drown him twice by pushing his head and face down into the water. J.W.H. further testified that he heard the same two people who dropped him into the water talking as they came back to the rivulet immediately prior to his throat being slit. Although he may have mixed up the voices as to which assailant made the comments J.W.H. remembers hearing, he consistently testified at the preliminary hearing and at trial that White Hat and Shaw discussed checking his dead body and talked about hiding their crimes by leaving J.W.H. in the water out in the woods.

[¶ 50.] In addition, Shaw himself gave statements to police that established he had returned to the truck and had abandoned J.W.H. at the rivulet. Shaw also admitted he had handed White Hat his lighter so that White Hat could look for the knife used in the attack after it had been dropped to the ground. He did so only after the knife was recovered from White Hat's car several days after the attack, electing to remain silent as to its location until confronted with its discovery. In addition, defense witness K.D. testified that Shaw and White Hat had been the only two members of the party at the

rivulet when J.W.H.'s throat was slit. The evidence in the record and the most favorable inferences that could have been drawn by the jury support a finding that Shaw was not an innocent bystander, but rather an active participant in the near fatal attack on J.W.H.

[¶ 51.] There were sufficient corroborating facts and testimony, in addition to the circumstantial evidence, to support the conviction. The trial court did not err when it held there was sufficient evidence in the record to support the conviction and denied Shaw's motion for judgment of acquittal.

[¶ 52.] **3. Whether the trial court erred in refusing to grant a new trial when alleged exculpatory evidence was discovered after trial.**

[¶ 53.] On November 7, 2003, just three days after trial on the matter, Shaw's defense counsel discovered a letter written by White Hat six months after the assault. Shaw's defense counsel knew of the existence of the letter, but was informed by Shaw that it had been destroyed. Defense counsel had also discussed the existence of the letter with Shaw's previous defense counsel, whose file did not contain such a letter. A chance conversation with yet another attorney who, unbeknownst to defense counsel, was representing White Hat on a potential habeas corpus petition resulted in the discovery of the letter.

[¶ 54.] Shaw entered a motion for new trial along with the letter dated January 1, 2000, that read:

I Joseph White Hat state that James Shaw did not help in any way, cut the throat of [J.W.H.]. Although he did physically assault him erlier [sic] that night. From my point of view Mr. Pond was the ring leader of the whole dilema [sic]. While I was being interrogated by Deputy Baker, I was given the impression that I was to say that James Shaw held [J.W.H.'s] head up, while I lacerated his throat. I don't know why I said that Mr. Shaw held up [J.W.H.'s], because that is untrue. James Shaw did not hold up [J.W.H.]'s head while I lacerated his throat.

The trial court denied the motion for new trial from the bench at the sentencing hearing, stating that the probative value of the letter was contradicted by available rebuttal testimony such as White Hat's presentence report, and his statements to police. The trial court went on to state that given White Hat's complete lack of credibility on any subject, the letter would not have impacted the jury's decision.

[¶ 55.] A defendant who seeks a new trial under SDCL 15-6-59(a)[6] based on after-discovered evidence must show: "(1) the evidence was undiscovered by the movant at the time of trial; (2) the evidence is material, not merely cumulative or impeaching; (3) that it would probably produce an acquittal; and (4) that no lack of diligence caused the movant to fail to discover the evidence earlier." *State v. Reyes*, 2005 SD 46, ¶ 28, 695 N.W.2d 245, 255 (quoting *State v. Gehm*, 1999 SD 82, ¶ 13, 600 N.W.2d 535, 540). Because we conclude that the newly discovered evidence would have been cumulative and probably would not have produced an acquittal, we will discuss only those elements.

---

6.  SDCL 15-6-59(a) provides in relevant part: A new trial may be granted to all or any of the parties and on all or part of the issues for any of the following causes:

    . . .

(4) Newly discovered evidence, material to the party making the application, which he could not with reasonable diligence have discovered and produced at the trial[.]

[¶ 56.] Shaw's purpose in admitting the letter would have been to undermine J.W.H.'s account of the events on the night of the assault. This Shaw was able to do by impeaching J.W.H. with his preliminary hearing testimony and his statements to police on July 11, 1999, that it was White Hat and White Hat alone that had been the perpetrator of the assault and attempted murder. The letter would have been cumulative at best if believed by the jury, as Shaw had already utilized other available testimony and evidence to support this theory of defense, such as the absence of Shaw's fingerprints on the knife used in the attack.

[¶ 57.] The question we must ask and answer is not whether the verdict would have *possibly* been different if the letter had been available and admitted at trial, but rather would it *probably* have been different. *See Gehm*, 1999 SD 82, ¶ 18, 600 N.W.2d at 542. If the letter had been admitted, it is more than likely that the State would have impeached White Hat with his statements to police and information contained in his presentence report which completely contradicted the contents of the letter. Given that the defense disclosed to the jury that White Hat had been convicted and sentenced for the attempted murder of J.W.H., it is unlikely the letter would have convinced the jury to discredit the victim's testimony and the other corroborating evidence entered at trial. The trial court did not err when it denied Shaw's motion for new trial based on the newly discovered evidence.

[¶ 58.] We affirm Shaw's convictions on the aggravated assault and attempted first degree murder charges.

[¶ 59.] KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.

[¶ 60.] SABERS, Justice, dissents.

SABERS, Justice (dissenting).

[¶ 61.] **1. A. The trial court erred in ruling that prior non-hearsay statements cannot be used as substantive proof of the matter asserted.**

[¶ 62.] During the trial, the victim made several statements that were inconsistent with statements he had made either to the police or at the preliminary hearing. Shaw maintained that the statements were either prior inconsistent testimony or statements of identification under SDCL 19-16-2[7] and not hearsay and admissible for the truth of the matter asserted. At trial, the defense proposed Criminal Pattern Jury Instruction 1-15-9, excluding the clause in parentheses. The instruction provides:

The credibility of a witness may be attacked by introducing evidence that on some former occasion the witness made a statement on a matter of fact or acted in a manner inconsistent with the witness' testimony in this case on a matter material to the issues. Evidence of this kind may be considered by you in connection with all the other facts and circumstances in evidence in deciding the weight to be given to the testimony of that witness, (but you must not consider

---

7. SDCL 19-16-2, which is similar to Federal Rule 801(d)(1), provides:

A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

(1) Inconsistent with his testimony and was given under oath and subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition; or

(2) Consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive; or

(3) One of identification of a person made after perceiving him.

any such prior statement as establishing the truth of any fact contained in that statement.)

Criminal Pattern Jury Instruction 1–15–9. Because several of the statements were statements of identification and not hearsay under SDCL 19–16–2 and could be used as substantive evidence, the defense sought to exclude the last clause of the jury instruction. The trial court refused and used the full jury instruction. Shaw asserts that this was error and that the error prejudiced him in that it likely had some effect on the jury and was harmful to his substantial rights. I agree.

8. The following excerpt from the trial transcript reveals the victim's inconsistent testimony:

Mr. Rensch: I will direct counsel's attention to the preliminary hearing transcript dated 7–22–1999. Page—it's the second one from the end of [J.W.H.'s] testimony.

Q: (By Mr. Rensch) I would be referring to page 25 of the preliminary hearing transcript and I want to ask you if you were asked these questions and if you gave this answer about kicking. Question, "And then you said later on that people were kicking you, but you don't know for sure who was doing what?" Answer, "I did not know who was kicking me at that time." Question, "And you couldn't identify who was doing what to you?" Answer, "No." Sir, were you asked those questions and did you give those answers at the preliminary hearing of this matter on July 22, 1999?

A: Can I see it?

Q: Yes. Lines 18 through 25.

A: Yes.

9. The relevant testimony is as follows:

Q: (By Mr. Rensch) All right. I want to ask you if you were asked this and if you gave this answer. Question by Deputy Baker, "What happened after they were kicking you?" Answer, "Um they got done, I was laying there, I was too sore to move, I hurt, I just laid there, and Shaw and [White Hat] picked me up underneath each arm and drug me into the water and dropped me in the water and I am

[¶ 63.] The victim testified at the preliminary hearing, while under oath and subject to cross-examination, that he did not know who was kicking him. However, at trial, the victim testified that both White Hat and Shaw kicked him.[8] Also, in an interview with the police ten days after the attack, the victim stated that White Hat had held his head under the water. However, at trial, the victim testified that "they" held him under the water.[9] The victim told the police that White Hat grabbed the back of his head and cut his throat, but at trial he testified that "they" grabbed him by the back of the neck and cut his throat.[10] The victim also told po-

pretty sure it was [White Hat] that stepped on my head and pushed my head underneath the water." Did you give that answer to that question, Sir?

A: Yes, I did.

Q: Okay. And I want to ask you if you were asked this question and gave this answer, same page. Mr. Vander Heide: What page is that? Mr. Rensch: 8 from the back.

Q: (By Mr. Rensch) "How long was your head under the water?" Answer, "20 to 25 seconds." Question, "And this whole 20 to 25 seconds your head was being held under the water?" Answer, "Yes, it was." Question, "Do you know by who?" Answer, "By [White Hat]." Did you give those answers to those questions, sir?

A: If that's what it says.

10. J.W.H. testified as follows:

Q: (By Mr. Rensch) You just told us that you don't know who cut your throat and I want to ask if you were asked these questions and gave these answers. Question, by Deputy Baker, "Okay, so you know it was [White Hat] that cut your throat?" Answer, "Yes." Question, "You're absolutely positive?" Answer, "Yes." Question, "And he did it on his own?" Answer, "Yes." Did you give those answers to those questions?

A: If that's what it says, yes.

Q: Do you want to look at it so we can make sure you know what it says?

A: No.

lice that after his throat was cut, he heard White Hat make a remark to the effect that because of their remote location no one was going to find him. At trial, he testified that it was Shaw who made that comment.[11]

[¶ 64.] This Court has noted that "[t]he authorities recognize that prior inconsistent testimony may be admitted as substantive evidence and that instructions limiting their use may be ineffective or inappropriate." *State v. Andrews*, 393 N.W.2d 76, 82 (S.D.1986). Furthermore, the comment to Criminal Pattern Jury Instruction 1–15–9 provides: "[t]he portion of the instruction in parenthesis is a proper statement of the law *only when the former statement is used solely for impeachment.*" (emphasis added).

[¶ 65.] Here, the statement that the victim made at the preliminary hearing was testimony subject to SDCL 19–16–2(1) and the statements that the victim made to the police were statements of identification subject to SDCL 19–16–2(3). These statements are not hearsay and should have been admitted as substantive evidence. Therefore, the trial court erred in instructing the jury that the statements could not be used for the truth of the matter asserted.

[¶ 66.] **B.  The trial court's ruling was prejudicial.**

[¶ 67.] The law is clear that prior inconsistent testimony and statements of identification are not hearsay and therefore can be used to prove the truth of the matter asserted. SDCL 19–16–2; *Andrews*, 393 N.W.2d at 82. The failure to properly instruct on the use of prior statements that are not hearsay can mislead and confuse the jury. Any instruction that is misleading, conflicting, or confusing may create reversible error. *State v. Moran*, 2003 SD 14, ¶ 15, 657 N.W.2d 319, 324 (citing *Schaffer v. Edward D. Jones & Co.*, 1996 SD 94, ¶ 19, 552 N.W.2d 801, 808). "Prejudice to the complaining party includes the possibility that the jury based its decision on incorrect law." *Dawson v. New York Life Insurance Co.*, 135 F.3d 1158, 1165 (7th Cir.1998).

[¶ 68.]  By instructing the jury that they could not use J.W.H.'s statements substantively, the trial court erroneously informed the jury as to the appropriate use of statements that state law dictates are "not hearsay." Even though Shaw's attorney asserted during his closing argument that if J.W.H.'s prior statements are considered true it shows that Shaw did not try to kill him, the jury was specifically instructed that they "*must not consider any such prior statement as establishing the truth of any fact contained in that statement.*" (emphasis added). This instruction was erroneous and it prevented the jury from considering J.W.H.'s prior statements as exculpable evidence to Shaw.

---

. . .
Q:  (By Mr. Rensch) Were you asked these questions and did you give these answers? Question, "Nobody else grabbed you by the back of the head and pulled your head up while he cut your throat?" Answer, "No. It was just him." Question, "And again, tell me how far was Shaw away when [White Hat] cut your throat?" Answer, "About 15 yards away." Did you give those answers to those questions, sir?

A:  If that's what is says, yes.

11.  J.W.H. testified as follows:

Q:  (By Mr. Rensch) Question, by the deputy, "Do you remember what they said?" You said, "Um they said, well, they'll never find him. He's out here." Question, "Do you remember who said that?" Answer, "[White Hat] did."

A:  (By [J.W.H.]) If that's what it has, that's what I said.

[¶ 69.] Furthermore, "[a]lthough errors in instructing the jury do not always rise to a constitutional level ... if the error goes to the heart of a defendant's theory of defense it can infringe upon the defendant's rights to due process and jury trial." *Miller v. State*, 338 N.W.2d 673, 676 (S.D. 1983) (citing *Zemina v. Solem*, 438 F.Supp. 455 (D.S.D.1977) *aff'd* 573 F.2d 1027 (8th Cir.1978)). Here, the heart of Shaw's defense is that he did not try to kill or help White Hat try to kill J.W.H. J.W.H.'s prior statements, if truthful, establish that White Hat was the one who tried to kill J.W.H., not Shaw. The truth of the matter asserted in these statements was central to the defense theory. Yet, the jury was instructed that the prior statements could not be used for the truth of the matter asserted. Therefore, the erroneous jury instruction was harmful to Shaw's substantial rights of due process and fair trial.

[¶ 70.] "When jury instructions, taken as a whole, give the jury a misleading impression or inadequate understanding of the law, a new trial is warranted." *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 232 (2nd Cir.1991). *See also Dawson*, 135 F.3d at 1165 (stating that "[i]f the misleading instruction did prejudice the complaining party, the proper remedy is a new trial"); *Cervelli v. Graves*, 661 P.2d 1032, 1040 (Wyo.1983) (stating that the "appellant should have the benefit of having his case decided by a properly instructed jury rather than by the trial court through an incorrect jury instruction").

[¶ 71.] Based on the above, the trial court erred in instructing the jury regarding the use of these non-hearsay prior statements. In all probability, the erroneous instruction likely produced some effect upon the verdict and was harmful to Shaw's substantial rights and denied him a fair trial. *See State v. Janklow*, 2005 SD 25, ¶ 25, 693 N.W.2d 685, 695. We should reverse and remand for a new trial so that the jury can be properly instructed as to the use of prior non-hearsay statements.

[¶ 72.] Issues 2 and 3 need not be reached because we should reverse and remand on Issues 1A and 1B.